UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

COLLIER ENTERPRISES MANAGEMENT 401K PROFIT
SHARING PLAN, VALLEY FINANCIAL GROUP, LLLP,
BGC II, LP, CE DIVERSIFIED FINANCIAL, LLLP,
COLLIER FAMILY OFFICE, INC. 401K PLAN, CH
MOTORCARS, LLC 401K PLAN, THE COLLIER
FOUNDATION, INC., COLLIER ASSET GROUP, L.P.,
INGLIS U. COLLIER IRREVOCABLE TRUST II,
LAURA ISABEL UPPERCU COLLIER TRUST, MILES C.
COLLIER REV. TRUST U/A DATED 4/26/2002,
THERESA A. COLLIER REV. TRUST U/A DATED
5/20/98, MCCEC, L.P., MCC FINANCIAL GROUP, L.P.,
MILES C. COLLIER GRANTOR RETAINED ANNUITY
TRUST DATED 12/14/00, MCC-PCM, INC., MCC-PCM,
INC. #2, PJC FINANCIAL GROUP, L.P., MILL PARK
FOUNDATION, INC., ISABEL COLLIER READ
IRREVOCABLE TRUST DATED 12/29/81, AS
AMENDED, ISABEL COLLIER READ CHARITABLE
REMAINDER ANNUITY TRUST, COLLIER ASSET
GROUP 2007 TRUST, WILLIAM A. READ, JR. TRUST,
BARRON GORDON COLLIER V TRUST, BARRON G.
COLLIER II REVOCABLE TRUST, CHARLOTTE
WILK COLLIER MINORITY TRUST U/A DATED 8/10/95,
PARKER J. COLLIER REV. TRUST U/A DATED 12/19/97,
MPC-AJP, LLLP, MPC-PPW, LLLP, THE EQUESTRIAN
CENTER AT HORSE CREEK, LLC 401K PLAN, AUBURN
FOUNDATION, INC. and WYOMING PHILANTHROPIC
TRUST INC.,

                                        Plaintiffs,

v.

THE BEAR STEARNS COMPANIES LLC (F/K/A BEAR
STEARNS COMPANIES INC.), ALAN D. SCHWARTZ,
SAMUEL L. MOLINARO, JR., JAMES CAYNE, WARREN
SPECTOR and DELOITTE & TOUCHE LLP

                                        Defendants.

---

**COMPLAINT**

**JURY TRIAL DEMANDED**

Index No.:

TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ................................................................................1

II.  JURISDICTION AND VENUE ............................................................................3

III.  PARTIES ..............................................................................................................4

IV.  FACTUAL BACKGROUND................................................................................7

    A.  Bear's Significant Exposure to the U.S. Residential Mortgage Market .................7

    B.  Material Misrepresentations and Omissions by Bear Defendants ..........................9

        1.  Defendants' 2006 Misrepresentations and Omissions Regarding
            Bear's Exposure to the Growing Subprime Crisis.......................................9

        2.  Misrepresentations and Omissions Regarding the Value of Bear's
            Assets in February 2007............................................................................10

        3.  Misrepresentations and Omissions Regarding Bear's Risk Management
            and the Value of Bear's Assets in Bear's 2006 10-K ...............................15

        4.  Misrepresentations and Omissions in Bear's April, 2007 10-Q ...............22

        5.  Misrepresentations and Omissions Regarding Bear's Book Value, the
            Adequacy of Bear's Liquidity and Capital Reserves, the Value of Bear's
            Assets, Bear's Financial Condition and Bear's Risk Management
            Following the Collapse of Bear's Hedge Funds ........................................24

        6.  Misrepresentations and Omissions Regarding Bear's Book Value,
            the Adequacy of Bear's Liquidity and Capital Reserves, the Value
             of Bear's Assets and Bear's Financial Condition at Bear's "Investor
            Day".........................................................................................................40

        7.  Misrepresentations and Omissions Regarding Bear's Risk Management
            and the Value of Bear's Assets in Bear's 2007 10-K ...............................46

    C.  The SEC's Comment Letters ................................................................................51

    D.  The Collapse of Bear ...........................................................................................54

    E.  Plaintiffs' Damages..............................................................................................57

F.     Bear Stearns' Practices Violated Accounting Standards ........................................57

    1.    GAAP Overview ....................................................................................58

    2.    Fraud Risk Factors Present at Bear Stearns ..............................................60

        a.    Fraud Risk Factors Applicable to Depository and Lending Institutions .........................................................................60

        b.    Risk Factors Applicable to Brokers and Dealers in Securities ......61

    3.    Audit Risk Alerts ...................................................................................62

    4.    Bear Stearns Falsely Represented that its Internal Controls Over Financial Reporting Were Effective ...........................................................64

        a.    Risk Management ..........................................................68

        b.    Pricing Models and VaR Systems .....................................69

    5.    GAAP Violations Relating to Bear's Financial Statements .....................70

        a.    Bear Stearns Misstated Its Exposure to Loss from the Failed Hedge Funds ...............................................................70

        b.    Bear Stearns' Financial Statements Misrepresented its Exposure to Decline in the Value of Retained Interests ...............74

        c.    GAAP Violations Related to Failure to Appropriately Determine the Fair Value of Financial Instruments ......................78

        d.    Bear Stearns Failed to Provide Adequate Disclosure About Risk and Uncertainties ...............................................84

        e.    Bear Stearns Failed to Provide Reliable Disclosures to Investors in Accordance with SEC Regulations ..........................86

G.    Deloitte's Deficient Audits of Bear's Financial Statements and Its Materially False and Misleading Assurances of Their Accuracy ..........................87

    1.    Overview of GAAS ................................................................................89

    2.    GAAS Required Deloitte to Consider Risk Factors as Part of Audit Planning ...........................................................................................90

        a.    Fraud Risk Alerts Relevant to Deloitte's Audit of Bear ...............90

       b.    Audit Risk Alerts Relevant to Deloitte's Audit of Bear Stearns ................................................................................91

       c.    Deloitte's Experience Auditing the Hedge Funds .........................92

    3.    Red Flags Recklessly or Deliberately Disregarded by Deloitte.................93

       a.    Bear Stearns' Misleading Fair Value Measurements.....................93

       b.    Bear Stearns' Failures to Disclose Risks Inherent In Its Financial Statements .................................................................96

       c.    Bear Stearns' Misleading Accounting Treatment of the Hedge Fund Bailout ..................................................................97

       d.    Bear Stearns' Failure to Disclose Critical Information Relating to the Company's Valuation of Its Financial Instruments.................................................................................98

       e.    Bear Stearns' Inadequate Internal Controls ................................100

       f.    Bear Stearns' Deficient Internal Audit Function .........................104

ADDITIONAL SCIENTER ALLEGATIONS .........................................................106

    James E.  Cayne .................................................................................................107

    Warren Spector ..................................................................................................109

    Alan D. Schwartz ...............................................................................................111

    Samuel L. Molinaro, Jr. .....................................................................................114

    Bear Stearns Companies Inc. ..............................................................................118

    Deloitte & Touche LLP .....................................................................................120

LOSS CAUSATION ..............................................................................................122

    *June 22, 2007 Partial Corrective Disclosure* .................................................123

    *July 18, 2007 Partial Corrective Disclosure* .................................................124

    *September 20, 2007 Partial Corrective Disclosure* .........................................125

    *November 14, 2007 Partial Corrective Disclosure* .........................................125

*December 20, 2007 Partial Corrective Disclosure* ........................................................126

*March 14, 2008 Partial Corrective Disclosure* ...........................................................127

*March 16, 2008 Partial Corrective Disclosure* ...........................................................127

PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET .............................................128

NO SAFE HARBOR ..................................................................................................129

V.   CLAIMS FOR RELIEF .....................................................................................130

Count I ...................................................................................................................130
(Section 10(b) of the Securities Exchange Act of 1934
and SEC Rule 10b-5—Manipulative and Deceptive Devices)

Count II ..................................................................................................................131
(Section 18 of the Securities Exchange Act
of 1934—Misleading Statements)

COUNT III................................................................................................................133
(Section 20 of the Securities Exchange Act
of 1934—Control Persons)

Count IV..................................................................................................................133
(Common Law Fraud)

VI.   PRAYER FOR RELIEF .....................................................................................136

Demand for Jury Trial..............................................................................................136

Plaintiffs Collier Enterprises Management 401k Profit Sharing Plan, Valley Financial Group, LLP, BGC II, LP, CE Diversified Financial, LLLP, Collier Family Office, Inc. 401k Plan, CH Motorcars, LLC 401k Plan, The Collier Foundation, Inc., Collier Asset Group, L.P., Inglis U. Collier Irrevocable Trust II, Laura Isabel Uppercu Collier Trust, Miles C. Collier Rev. Tust U/A Dated 4/26/2002, Theresa A. Collier Rev. Trust U/A Dated 5/20/98, MCCEC. L.P., MCC Financial Group, L.P., Miles C. Collier Grantor Retained Annuity Trust Dated 12/14/00, MCC-PCM, Inc., MCC-PCM, Inc. #2, PJC Financial Group, L.P., Mill Park Foundation, Inc., Isabel Collier Read Irrevocable Trust Dated 12/29/81, as amended, Isabel Collier Read Charitable Remainder Annuity Trust, Collier Asset Group 2007 Trust, William A. Read, Jr. Trust, Barron Gordon Collier V Trust, Barron G. Collier, II Revocable Trust, Charlotte Wilk Collier Minority Trust U/A Dated 8/10/95, Parker J. Collier Rev. Trust U/A Dated 12/19/97, MPC-AJP, LLLP, MPC-PPW, LLLP, The Equestrian Center at Horse Creek, LLC 401k Plan, Auburn Foundation, Inc., and Wyoming Philanthropic Trust, Inc. (hereinafter referred to collectively as "Collier" or "Plaintiffs") allege the following upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters:

## I.   PRELIMINARY STATEMENT

1.      This action arises out of a valuation fraud committed on Plaintiffs by Defendants, Bear, Alan D. Schwartz ("Schwartz"), Samuel L. Molinaro, Jr. ("Molinaro"), James Cayne ("Cayne"), Warren Spector ("Spector") and Deloitte & Touche LLP ("Deloitte") (collectively "Defendants").

2.      In the spring of 2008, Bear Stearns Companies Inc. ("Bear", "Bear Stearns" or "the Company") collapsed in one of the most spectacular failures in U.S. business history. While

Bear's precarious state was known to Defendants, they misrepresented and concealed the true state of Bear's health to the public.

       3.     Defendants fraudulently overstated the value of Bear's mortgages, mortgage- and asset-backed securities and other derivative financial instruments both those Bear sold and those it retained ("Bear's assets"), the adequacy of its liquidity and capital reserves, and the quality of Bear's risk management, all with the intent of inducing Plaintiffs and other investors to retain and increase its investment in Bear, which Plaintiffs did. At the time of the events in question, Collier purchased and owned shares of Bear stock.

       4.     Defendants' material misrepresentations and omissions included, but were not limited to, the following:

      a.    Defendants Schwartz, Molinaro, Cayne and Spector intentionally and repeatedly materially overstated the adequacy of Bear's capital reserves and its liquidity;

      b.    Defendants Bear, Schwartz, Molinaro, Cayne and Spector repeatedly materially misrepresented the value of Bear's assets as well as their valuation procedures in Bear's public financial statements; and

      c.    Defendant Deloitte repeatedly falsely certified that Bear's false and misleading financial statements "present[ ] fairly, in all material respects, the information set forth therein."

       5.     In fact, as the SEC revealed to the public only after Bear's collapse:

- Bear used outdated, ten-year-old models to assign values to its mortgage-backed securities which it failed to review even after the SEC warned Bear about them;

- Bear failed to review, evaluate, or update its Value at Risk models, which were key to Bear's risk management; and

- Bear publicly reported values for its assets that were materially higher than those assigned by Bear's own risk managers and higher than Bear itself used for those same assets in transactions with counterparties.

6.     By virtue of the misrepresentations and omissions alleged in this Complaint, Defendants accomplished their intent of deceiving the investing public regarding Bear's financial condition and the quality of Bear's risk management, thereby artificially inflating the price of Bear stock and causing Collier to purchase Bear securities at inflated prices and to retain its investment in Bear when it would otherwise have sold.

7.     Defendants' material misrepresentations and omissions caused Collier's substantial losses.  The disclosure of the true value of Bear's assets and the insufficiency of Bear's liquidity and capital reserves resulted in Bear's ultimate collapse and the decline of Bear's stock price, thereby injuring Collier.  On or about March 14, 2008, when Bear acknowledged that it lacked the liquidity to continue operating, and had admitted that its assets were worth nearly $2 billion less than Bear had previously represented, Bear's share price dropped nearly 95%.  Between the market's Friday close and its Monday open on March 17, 2008, Bear shares fell to as low as $2.84 per share following the announcement by JPMorgan Chase & Co. ("JPMorgan") that it had reached an agreement to purchase Bear for two dollars per share. That day Collier owned 455,174 now nearly worthless shares of Bear causing it a realized loss of more than $40,000,000.

8.     By virtue of the material misrepresentations and omissions made to Collier, Defendants are liable to Collier under, *inter alia*, Sections 10(b), 18(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j, 78r and 78t, including Rule 10b-5 promulgated under § 10(b) by the Securities and Exchange Commission ("SEC") (17 C.F.R. 240.10b-5), and under, *inter alia,* the common law of the State of New York.

## II.   JURISDICTION AND VENUE

9.   This Court has jurisdiction over this action pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, 28 U.S.C. §§ 1331, 1332 and 1367(a).  The claims asserted herein arise under §§ 10(b), 18(a) and 20(a) of the Exchange Act, SEC Rule 10b-5 and the common law of the State of New York.

10.   Venue is proper in this district under § 27 of the Exchange Act and 28 U.S.C. § 1391.  Bear and J.P.  Morgan have offices in this district and many of the acts and transactions giving rise to the violations of law complained of occurred here.

11.   In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, telephone communications systems and facilities of the national securities markets.

## III.   PARTIES

12.   Collier Enterprises, headquartered in Naples, Florida, manages a broad range of businesses engaged in real estate investment and development, agriculture and private equity investments. The company was established in 1976 under the leadership of Miles C. Collier, grandson of Barron Gift Collier. This matter is brought on behalf of a number of these businesses, their investment vehicles and various Collier family trusts which were invested in Bear during the period in question. Collier owned shares of Bear stock at least as early as December 2006 and retained and continued to invest in Bear until Bear's collapse. Each Plaintiff is headquartered at 9045 Strada Stell Ct., Suite 500, Naples, Florida. Those Plaintiffs that purchased Bear securities during the period in question, Collier Enterprises Management 401k Profit Sharing Plan, Valley Financial Group, LLP, BGC II, LP, CE Diversified Financial, LLLP,

Collier Family Office, Inc. 401k Plan, CH Motorcars, LLC 401k Plan, The Collier Foundation,

Inc., Collier Asset Group, L.P., Inglis U. Collier Irrevocable Trust II, Laura Isabel Uppercu

Collier Trust, Miles C. Collier Rev. Tust U/A Dated 4/26/2002, Theresa A. Collier Rev. Trust

U/A Dated 5/20/98, MCCEC. L.P., MCC Financial Group, L.P., Miles C. Collier Grantor

Retained Annuity Trust Dated 12/14/00, MCC-PCM, Inc., MCC-PCM, Inc. #2, PJC Financial

Group, L.P., Mill Park Foundation, Inc., Isabel Collier Read Irrevocable Trust Dated 12/29/81,

as amended, Isabel Collier Read Charitable Remainder Annuity Trust, Collier Asset Group 2007

Trust, Parker J. Collier Rev. Trust U/A Dated 12/19/97, and The Equestrian Center at Horse

Creek, LLC 401k Plan, are further referred to as the "Purchasing Collier Entities."

13.     Each Plaintiff purchased Bear securities at inflated prices or retained its

investment in Bear when it would otherwise have sold during the period in question as a result of

the misrepresentations alleged in this Complaint.

14.     The Bear Stearns Companies Inc., the successor to Bear Stearns & Company and

Subsidiaries, was, from October 29, 1985 to May 30, 2008, a Delaware corporation with its

principal place of business in the State of New York.  On May 30, 2008 a wholly-owned

subsidiary of JPMorgan Chase & Co. merged with and into The Bear Stearns Companies Inc.,

becoming a wholly-owned subsidiary of JPMorgan Chase & Co.

15.     Effective on July 16, 2008, The Bear Stearns Companies, Inc. converted its form

of organization from that of a Delaware corporation to that of a Delaware limited liability

company under the name of The Bear Stearns Companies LLC.

16.     As JPMorgan Chase & Co. acknowledged in their Form 8-K filed July 16, 2008,

"The Bear Stearns Companies LLC is deemed to be the same entity as The Bear Stearns

Companies Inc. and the conversion constitutes a continuation of the existence of The Bear Stearns Companies Inc. in the form of a limited liability company."

17.     On or about October 1, 2008, Bear Stearns merged with an existing subsidiary of JPMorgan Chase & Co. known as J.P. Morgan Securities Inc.  Effective September 1, 2010, J.P. Morgan Securities Inc. converted from a corporation to a limited liability company and changes its name to J.P. Morgan Securities LLC.

18.     Defendant Bear, Stearns & Co., Inc., now known as J.P. Morgan Securities LLC, is a wholly owned subsidiary of J.P. Morgan Broker-Dealer Holdings, Inc., which is a wholly owned subsidiary of JPMorgan Chase & Co. JPMorgan Chase & Co. is a Delaware corporation with its principle place of business at 270 Park Avenue, New York, NY.

19.     Defendant James Cayne was the Chief Executive Officer ("CEO") of Bear from 1993 until January 2008 and Chairman of the Board from 2001 until Bear's collapse in March 2008.  He is a citizen of the State of New York.

20.     Defendant Warren Spector was Co-President and Co-Chief Operating Officer ("COO") of Bear from 2001 until August 2007.  Spector resigned these positions in August 2007, but remained Senior Managing Director of Bear until December 28, 2007.  He is a citizen of the State of New York.

21.     Defendant Alan D. Schwartz was Co-President and Co-Chief Operating Officer of Bear Stearns from June of 2001 until August of 2007.  He became sole President on August 5, 2007, and remained in that position until January 5, 2008, when he was named CEO of Bear. Schwartz served on Bear's Board of Directors throughout the relevant period.  During the relevant period, when the price of Bear Stearns' shares was artificially inflated, Schwartz sold 91,233 shares for a total realized value of $9,867,001. Mr. Schwartz is a citizen of Connecticut.

22.     Defendant Samuel L. Molinaro Jr was, at all relevant times, Chief Financial Officer ("CFO") and Executive Vice President of Bear Stearns.  On August 5, 2007, he was also appointed COO.  During the relevant period, when the price of Bear Stearns' shares was artificially inflated, Molinaro sold 38,552 shares for a total realized value of $4,230,828. Mr. Molinaro is a citizen of Connecticut.

23.     Defendants Cayne, Spector, Schwartz and Molinaro (the "Individual Defendants"), because of their positions with Bear, possessed the power and authority to control the contents of Bear's SEC filings, reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market.  They were provided with copies of Bear's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with Bear, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and the positive representations being made were then materially false and misleading.  In the alternative, the Individual Defendants were reckless in causing Bear to make the misleading statements regarding Bear's risk management and financial condition, including the value of Bear's assets and the sufficiency of Bear's liquidity and capital reserves, alleged in this Complaint.  The "Bear Defendants" are the Individual Defendants together with Bear Stearns.

24.     Deloitte & Touche LLP ("Deloitte") is a Delaware limited liability partnership and was, at all relevant times, the independent outside auditor for Bear and provided audit, audit-related, tax and other services to Bear.  While the independent outside auditor for Bear, Deloitte issued unqualified opinions on Bear's financial statements for fiscal years 2006 and 2007.

Deloitte consented to and caused the incorporation by reference of its unqualified opinions on Bear's financial statements for fiscal years 2006 and 2007.

## IV.    FACTUAL BACKGROUND

**A.    Plaintiffs' Investment Practices**

25.    Collier's investment strategy was designed and executed by Bruce Sherman. Sherman's trades, on behalf of Collier, were based on a long-term investment approach that focused on identifying companies whose securities were trading at a significant discount to the company's intrinsic value.

26.    The company's tangible book value (i.e., liquidation value) was an important factor in Sherman's analysis of the intrinsic value of a commercial bank, thrift (savings and loan) or investment bank such as Bear.

27.    Accordingly, a comparison of a financial company's tangible book value to the company's share price is an indication of the potential risk inherent in an investment in the company. All other things being equal, Sherman would view an investment in a financial company that trades at a low multiple of its tangible book value as having less risk than an investment in a competing company that trades at a higher multiple.

**B.    Bear's Significant Exposure to the U.S. Residential Mortgage Market**

28.    Since at least as early as 1995, Bear was a major participant in the U.S. residential mortgage market.  Bear was a leading originator and servicer of mortgages, including subprime mortgages.  Bear was the largest U.S. underwriter of mortgage-backed securities in 2006 and the second largest in 2007, when it underwrote $83 billion in such securities.  Bear further established hedge funds that traded heavily in mortgage-backed securities, including those backed by subprime mortgages.

29.     Bear also securitized mortgages into mortgage-backed securities, including collateralized debt obligations and collateralized mortgage obligations, which it then sold to investors or warehoused for later sale.

30.     Mortgages, mortgage- and asset-backed securities and other derivative financial instruments retained by Bear were a major component of Bear's value.

31.     In its 2004 10-K, Bear reported that it held $27.679 billion in mortgages, mortgage- and asset-backed securities and $12.711 billion in other derivative financial instruments.

32.     In its 2005 10-K, Bear reported that it held $40.297 billion in mortgages, mortgage- and asset-backed securities and $12.957 billion in other derivative financial instruments.

33.     In its 2006 10-K, Bear reported that it held $43.226 billion in mortgages, mortgage- and asset-backed securities and $11.617 billion in other derivative financial instruments.

34.     In its 2007 10-K, Bear reported that it held $46.141 billion in mortgages, mortgage- and asset-backed securities and $19.725 billion in other derivative financial instruments.

35.     Further, Bear securitized and sold mortgage loans to investors.  Under the terms of those deals, Bear was obligated to repurchase defective loans.  To the extent Bear overstated the quality of the mortgages it securitized and sold, as in fact happened, Bear concealed from investors in Bear the extent of the risk Bear faced from its obligation to repurchase the defective loans it had sold.

36.     Because the mortgages, mortgage- and asset-backed securities and other derivative financial instruments retained by Bear were a major component of Bear's value, if to the extent Bear overstated the value of these assets were materially overvalued by Bear, it would materially impact Bear's value was also overstated and would materially impact a reasonable investor's and Collier's and Sherman's view as to whether Bear was misvalued by the market.

9

37.     Unlike a private equity investor or company conducting due diligence for a potential acquisition, which is provided access to a company's internal books and its confidential correspondence with regulators, outside investors such as Collier were not permitted by Bear to review Bear's proprietary valuation models or the valuations ("marks") Bear assigned to the financial assets on its balance sheet or non-public regulatory inquiries or examinations. Thus, the accuracy of Bear's valuation of its retained, securitized and sold mortgages, mortgage- and asset-backed securities and other derivative financial instruments (i.e., the "marks" Bear took) was very important to Sherman and Collier, especially as Bear's revenues declined beginning in the second half of 2006.

38.     During 2007, Defendants acknowledged that Bear held as much as $57.5 billion in mortgages, mortgage- and asset-backed securities and other derivative financial instruments. Under Generally Accepted Accounting Principles ("GAAP"), the rules the SEC requires for financial reporting by publicly traded companies, such assets must be assigned a current market value – they must be "marked to market." The "mark-to-market" accounting under GAAP, which Bear was required to follow for reporting its balance sheet, was central to Sherman's inquiry, analysis and understanding of Bear's value on behalf of Collier. Defendants used internal valuation models to generate value estimates for its mortgages, mortgage- and asset-backed securities and other derivative financial instruments and then reported those estimates to the investing public in Bear's SEC filings.

**B.     Material Misrepresentations and Omissions by the Bear Defendants**

**1.     Defendants' 2006 Misrepresentations and Omissions Regarding Bear's Exposure to the Growing Subprime Crisis**

39.     Defendants claimed unique expertise in the mortgage-backed securities market. Bear's 2006 Annual Report, for example, states that Thomson Financial ranked Bear "No. 1" for

"US Mortgage-Backed Securities, US Mortgage-Backed Securities-Residential, US Whole Loans, and US Adjustable Rate Mortgages." That annual report goes on to state: "Our vertically integrated mortgage franchise allows us access to every step of the mortgage process, including origination, securitization, distribution and servicing."

40.    On December 14, 2006, Bear Stearns issued a press release regarding its fourth quarter and fiscal year end results for 2006, which closed on November 30, 2006.[1] The release reported diluted earnings per share of $4.00 for the fourth quarter ended November 30, 2006, up 38% from $2.90 per share for the fourth quarter of 2005, ending November 30, 2005. It also stated that its net income for the fourth quarter of 2006 was $563 million, up 38% from $407 million for the fourth quarter of 2005.

41.    Bear was only able to achieve these results by using valuation models that ignored declining housing prices and rising default rates. By using these inaccurate models Bear avoided taking losses on its Level 3 assets, increasing its revenues and earnings per share and falsely inflating the value of its stock.

42.    During a press conference on December 14, 2006, Molinaro fielded questions from analysts about Bear's exposure to the growing subprime crisis. Jeff Harte, an analyst at Sandler O'Neill, asked Molinaro whether the increased defaults threatened to make the securitization of those mortgages, which were increasingly being originated by Bear Stearns, a risky business. Molinaro responded "Well, I don't – no, it doesn't. Because essentially we're originating and securitizing." Molinaro's statement was false, in that Bear faced dangerous exposure through both the retained collateralized debt obligation ("CDO") tranches it kept on its books, through the agreements it maintained with counterparties and CDOs, and through repurchase agreements in connections with Bear's sales.

---

[1] Bear's fiscal year ran from December 1 to November 30.

43.    As a result of Bear's artificially inflated results and the false assurances by Molinaro, Bear's stock rose by $4.07, closing at $159.96.

44.    In reliance on Bear's artificially inflated results and the false assurances by Molinaro, Collier retained its existing Bear investment and purchased additional shares of Bear: On January 10, 2007, Collier, through Collier Enterprises Management 401(k) Profit Sharing Plan bought 1,800 shares of Bear at $164.96. Collier, through Collier Family Office, Inc. 401(k) Plan bought 100 shares of Bear at $165.21. Collier, through CH Motorcars, LLC 401(k) Plan bought 100 shares of Bear at $165.21. Collier, through Collier Asset Group, L.P. bought 3,900 shares of Bear at $164.96. Collier, through Theresa A. Collier Rev. Trust U/A Dated 05/20/98 bought 100 shares of Bear at $165.21. Collier, through MCCEC, L.P. bought 400 shares of Bear at $164.99. Collier, through MCC-PCM, Inc. bought 100 shares of Bear at $165.20. Collier, through PJC Financial Group, L.P. bought 400 shares of Bear at $164.99.  Collier, through Mill Park Foundation, Inc. bought 100 shares of Bear at $165.21. Collier, through The Equestrain Center at Horse Creek, LLC 401(k) Plan bought 100 shares of Bear at $165.21. On January 12, 2007, Collier, through Collier Family Office, Inc. 401(k) Plan bought 100 shares of Bear at $171.74. On January 16, 2007, Collier, through MCC-PCM, Inc. bought 100 shares of Bear at $170.71. On January 18, 2007, Collier, through The Collier Foundation, Inc. bought 100 shares of Bear at $169.63. On January 22, 2007, Collier, through PJC Financial Group, L.P. bought 600 shares of Bear at $168.66. On January 23, 2007, Collier, through Miles C. Collier Grantor Retained Annuity Trust Dated 12/14.00 bought 100 shares of Bear at $168.04. Collier, through Isabel Collier Read Irrevocable Trust Dated 12/29/81, as amended bought 18,600 shares of Bear at $167.79. On January 25, 2007, Collier, through Isabel Collier Read Charitable Remainder Annuity Trust bought 300 shares of Bear at $165.31. Collier, through Valley Financial Group,

LLLP bought 3,100 shares of Bear at $165.26. Collier, through Mill Park Foundation, Inc. bought 100 shares of Bear at $165.51. Collier, through BGC II, LP bought 1,800 shares of Bear at $165.26. Collier, through Laura Isabel Uppercu Collier Trust bought 100 shares of Bear at $165.51. Collier, through Theresa A. Collier Rev. Trust U/A Dated 5/20/98 bought 100 shares of Bear at $165.21. Collier, through MCCEC, L.P. bought 700 shares of Bear at $165.26. Collier, through MCC Financial Group, L.P. bought 11,300 shares of Bear at $165.26.

### 2. Misrepresentations and Omissions Regarding the Value of Bear's Assets in February 2007

45.     As the mortgage crisis worsened, the scope of the problems with subprime mortgages was reflected in two indices that closely tracked the markets for nonprime mortgages. The ABX index, launched in January of 2006, and the TABX index, introduced in February of 2007, synthesized subprime mortgage performance, refinancing opportunities, and housing price data into efficient market valuation of CDOs' primary assets: subprime RMBS tranches, via the ABX; and Mezzanine CDO tranches, via the TABX. These indices provided observable market indicators of CDO value. In fact, The Bank of International Settlements has observed that "ABX price information also seems to have been widely used by banks and other investors as a tool for hedging and trading as well as for gauging valuation effects on subprime mortgage portfolios more generally."

46.     In February of 2007, the ABX index, which tracks CDOs on certain risky subprime loans (those rated BBB), materially declined. According to Market Watch, in early February, the ABX Index was above 90. The index then declined to 72.71 by February 22, 2007, before declining further to 69.39 on February 23, 2007. An ABS strategist at RBS Greenwich Capital commented in a Market Watch article dated February 23, 2007 stated that "ABX needs protection sellers badly. . .  Real (not perceived) problems in select mortgage pools and in the

subprime mortgage lending industry do not make for an ideal fundamental opportunity at this time."

47.     Further, immediately upon launch TABX tranches materially declined, indicating that the value of many CDOs had plunged. As depicted in the chart below, the Senior TABX Tranche dropped from a price of nearly 100 in mid-February 2007, to around 85 by the end of February 2007. Indeed, the TABX continued to fall significantly in the months after February 2007, also as shown in the chart below reflecting historical TABX data from Markit Group of London.



48.     On or about February 9, 2007, Defendant Spector, Co-President and Co-Chief Operating Officer of Bear made a presentation at the Credit Suisse Financial Services Forum in Naples, Florida. The presentation, attended by Sherman, was designed to review significant developments in the company's operations and markets and to reassure investors that Bear's exposure to subprime mortgages posed no danger to Bear shareholders.

14

49.     While attending the presentation, Sherman was told by Spector that, as a result of

its unique expertise in the mortgage market, Bear was in no danger from subprime mortgages.

Spector reassured Sherman that Defendants understood the subprime mortgage market better

than other financial institutions because of Bear's leading role as an originator and servicer of

such mortgages.

50.     Spector further represented that as a result of its expertise, Bear had anticipated the

deterioration in the subprime mortgage market and was conservatively managing its exposure to

that market.

51.     Spector also assured Sherman of the accuracy of Bear's publicly disclosed balance

sheet, including the values Bear had reported for its retained mortgages, mortgage- and asset-

backed securities and other derivative financial instruments. Further, Spector told Sherman that

Bear's investment in mortgage-backed securities posed no risk to Bear's business and prospects

because of Bear's superior understanding of the mortgage-backed securities market.

52.     In fact, Spector's representations on behalf of Bear were materially false and

misleading when made.

53.     Bear Stearns and Spector were aware of the declines in the value of CDOs because it

was one of the 16 licensed market makers for the ABX and TABX.  The changes indicated that

the exceptionally risky tranches of CDOs that Bear kept on its books as retained interests were

rapidly losing value.  Because these assets were highly leveraged, their loss in value had serious

repercussions for Bear.

54.     Spector knew, or was reckless in not knowing, that the SEC had warned Bear at least

as early as 2005 that "Bear Stearns used outdated models that were more than ten years old to

value mortgage derivatives and had limited documentation on how the models worked."  "SEC's

Oversight of Bear Stearns and Related Entities:  The Consolidated Supervised Entity Program,"
U.S. Securities and Exchange Commission Office of Inspector General, September 25, 2008,
("2008 OIG Report", attached as Exhibit A) at 20).

55.    Spector also knew, or was reckless in not knowing, that Bear had not completed a
review of its mortgage derivative valuation models since the 2005 SEC warning.  See 2008 OIG
Report, Ex. A, at 23.

56.    Spector knew, or was reckless in not knowing, that Bear's models did not even
incorporate measures to take into account declines in housing prices until "towards the end of
2007."  Id. at 27.

57.    Spector also knew, or was reckless in not knowing, that Bear's valuation of its
retained mortgages, mortgage- and asset-backed securities and other derivative financial
instruments was based on seriously outdated and inaccurate models and that Bear had materially
overstated the value of those assets.  The problems identified in the SEC's 2005 warning letter
and the 2008 OIG Report were not available to the public, including Collier, prior to Bear's
collapse.

58.    Despite the fact that the SEC had warned Bear at least as early as 2005 that "[i]t was
critically imperative for Bear Stearns' risk managers to review mortgage models because its
primary business dealt with buying and selling mortgage-backed securities," Bear did not ever
complete a review of its models valuing mortgage- and other asset-back securities, as Spector
knew.  See 2008 OIG Report, Ex. A, at 20-23.

59.    As the SEC found: "the review of mortgage models that should have taken place
before the subprime crisis erupted in February 2007 appears to have never occurred, in the sense

that it was still a work in progress when Bear Stearns collapsed in March 2008." 2008 OIG
Report, Ex. A, at 23.

60.     Spector also knew, but concealed from Collier and Sherman, that the hedges on
Bear's mortgage-backed securities and other assets were inadequate and that Bear's own risk
managers thought that these hedges were inadequate.  See 2008 OIG Report, Ex. A, 21-22.

61.     Because the SEC's 2005 warning letter to Bear was not made public, and because
Bear maintained the strict confidentiality of its valuation models, nether Sherman nor Collier had
the information available to them  that would have alerted them  to the falsity of Spector's
statements.

62.     If Spector had revealed the truth about Bear's valuation of its mortgages, mortgage-
and asset-backed securities and other derivative financial instruments, Sherman and Collier
would have been able to accurately re-evaluate its view of Bear's value in light of the fact that a
material portion of the financial assets reflected in Bear's financial statements were not being
reflected at current market value, but were in fact overvalued.

63.     If Spector had revealed the truth about Bear's valuation of its mortgage-backed
securities, Sherman would have sold all or a substantial amount of Collier's  Bear investment.
However, in reliance on Bear's artificially inflated results and the false assurances by Spector,
Collier retained its current investment in Bear.

64.     On February 9, 2007, the day of Spector's presentation at the Credit Suisse forum,
Bear stock closed at $159.73.

65.     Even as the indices tracking subprime performance began to crater, Bear embarked
on an aggressive expansion of its subprime business.  On February 12, 2007, the Company
completed its acquisition of ECC, a major originator of subprime loans.

66.     Bear Stearns knew that investors would flee if they found out that Bear was failing to undertake any meaningful assessment of its exposure to risk while it aggressively expanded its exposure to subprime losses.

### 3.     Misrepresentations and Omissions Regarding Bear's Risk Management and the Value of Bear's Assets in Bear's 2006 10-K

67.     In its Form 10-K for fiscal year 2006, filed February 13, 2007, Bear reported reassuringly low VaR numbers, including an aggregate risk of just $28.8 million – far lower than its peers.  This statement was wildly misleading, in that Bear knew that its VaR modeling failed to reflect its exposure to declining housing prices and rising default rates.

68.     Bear Stearns also asserted, "Bear regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss."  In fact, Bear had undertaken no such review, and had been repeatedly warned by government regulators that its VaR models were inaccurate and out of date.

69.     Bear also asserted that it marked all positions to market on a daily basis and that it independently verified its inventory pricing.  It assessed the value of its Level 3 assets as $12.1 billion.

70.     These statements were materially misleading, in that Bear knew that the models it used to value its Level 3 mortgage-backed assets were badly out of date and did not reflect crucial data about housing prices and default rates.  It also knew that its hamstrung risk managers had little power to provide any independent review of these figures.

71.     Because Bear was failing to take appropriate losses on its Level 3 assets, the revenues and earnings per share it reported in its 2006 Form 10-K were false and misleading, artificially inflating the value of its stock.

72.     Defendants Cayne and Molinaro executed a certification of these statements, annexed as an exhibit to the Form 10-K filing, stating that they had put in place disclosure controls and procedures to ensure the accuracy of Bear's filings, and that they had:

> Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared.

73.     Accordingly, at the time Bear filed its Form 10-K for 2006, Defendants Cayne and Molinaro had taken care to inform themselves of Bear's improper risk management and valuation practices, and knew the harmful consequences this deception would have on investors. Moreover, the SEC had reported its findings regarding Bear's deficient models to Molinaro's immediate subordinate, Farber.

74.     Bear's artificially low VaR numbers stood in sharp contrast to the risk exposures that many of its peers were reporting during the housing crisis. For the first half of 2007, as other investment banks with substantial subprime holdings saw their VaR figures increase dramatically in tandem with rising problems in the housing market, Bear Stearns' reported VaR remained virtually unchanged and much lower than peers.



**Average Daily Value-at-Risk**

Sources: Company 10-K's and 10-Q's. The reported quarterly average of daily value-at-risk amounts is used.

75.     Bear stated that "review of pricing models" was part of Bear's effort "in ensuring the integrity and clarity of the daily profit and loss statements" because "a clear understanding of how its positions generate profit or loss on a daily basis is crucial to managing risk." For example, Bear's 2006 10-K represented that in reviewing the models it used to value its mortgages, mortgage- and asset-backed securities and other derivative financial instruments, Bear had "compared its model-based valuations with counterparties in conjunction with collateral exchange agreements."

76.     This representation regarding Bear's comparison of its model-based valuations with its counterparties' was materially false and misleading when made.  Defendants knew, or were reckless in not knowing, that Bear did not use such comparisons to verify or correct its model-based valuations.  When Bear's comparison of its model-based valuations with counterparties

showed that Bear's assets were worth less than what Bear represented, Bear continued to use the higher, model-based values in its representations to the public.

77.     Bear's 2006 10-K further represented that Bear's risk management procedures "begin with Bear marking its financial instruments owned to fair value on a daily basis" and purported to disclose the "fair value" of Bear's holdings and obligations regarding mortgages, mortgage- and asset-backed securities and other derivative financial instruments.

78.     These representations were materially false and misleading when made.  Defendants knew, or were reckless in not knowing that, among other things, the SEC had confidentially warned Bear in 2005 that Bear was using "outdated models more than ten years old to value mortgage derivatives" and that these models had not been reviewed since the SEC warning. Further, Defendants knew, or were reckless in not knowing, that Bear's valuation models did not even incorporate measures to take declines in housing prices into account until "towards the end of 2007."  2008 OIG Report, Ex. A, at 27.  Thus, Defendants knew, or were reckless in not knowing, that Bear's valuation of its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments was not accurate and instead materially overvalued those assets.

79.     Further, in discussing Bear's "Value at Risk" ("VaR") models, a key element of Bear's risk management, Bear represented that it "regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss."

80.     This representation was materially false and misleading when made.  As the SEC found and as defendant Cayne knew, "Bear Stearns did not periodically evaluate its VaR models, nor did it timely update inputs to its VaR models."  Since Bear used outdated and inaccurate

models to value its assets, Bear could not accurately predict credit risk and Bear's "daily VaR amounts could have been based on obsolete data." 2008 OIG Report, Ex. A, at 20.

81.     Bear's reported VaR numbers were significant to the market. In a February 9, 2007 prefiling comment, Credit Suisse analysts Susan Roth Katzke and Ross Seiden stated that Bear's "management will continue to invest to grow revenues via new products and new geographies, rather than increasing VaR (the latter has been most stable amongst peers)." These same analysts noted in a February 14, 2007 report: "VaR and Revenue Growth; RoE and Book Value…Tying these elements together with valuation leads us to the conclusion that Bear ought to be a lower risk play in the brokerage group. From a business perspective, note that Bear's revenue growth has kept pace with peers, with far less VaR."

82.     As a result of Bear's continuing misrepresentations about its 2006 results and its VaR exposure, its stock rose $5.71 on February 14, 2007, to close at $165.81.

83.     On behalf of Collier, Sherman read these materially false and misleading representations in Bear's 2006 10-K, consistent with his practice of reading all of Bear's Form 10-K and 10-Q filings, and relied on these materially false and misleading representations in his analysis of Bear and in deciding whether he should retain shares of Bear stock or purchase additional shares of Bear stock.

84.     In reliance on the misrepresentations and omissions in Bear's 2006 10-K, Collier retained its Bear investment and purchased additional shares: On February 27, 2007, Collier, through CE Diversified Financial, LLLP bought 1,800 shares of Bear at $153.50. On March 2, 2007, Collier, through CH Motorcars, LLC 401(k) Plan bought 100 shares of Bear at $149.41. On March 6, 2007, Collier, through Miles C. Collier Rev. Trust U/A Dated 04/26/2002 bought 3,600 shares of Bear at $148.45.

85.     As a result of Defendants' misrepresentations and omissions, Credit Suisse analysts continued to tout Bear's strong revenue growth and unusually low VaR numbers.  In a March 5, 2007 report on Bear, they reported that:

> Not only has revenue growth been equal to or better than peers, the volatility of the revenue stream has been lower.  **This lower level of revenue (and earnings) volatility is consistent with Bear Stearns' less aggressive principal/proprietary trading posture-less VaR and lower loss rates.**
>
> What's driven above-average equities revenue growth for Bear Stearns? Best we can tell, it's the combination of hedge fund client focus, personnel upgrades, and a somewhat increased capital commitment.  How much capital?  **Judging by the relatively low level of VaR committed to the business, we think Bear's willingness to use capital is still quite limited.**

86.     Less than two weeks later, on March 15, 2007, Bear issued a press release touting its results for the first quarter of 2007.  The press release provided, in relevant part, the following:

> The Bear Stearns Companies Inc. (NYSE:BSC) today reported earnings per share (diluted) of $3.82 for the first quarter ended February 28, 2007, up 8% from $3.54 per share for the first quarter of 2006.  Net income for the first quarter of 2007 was $554 million, up 8% from $514 million for the first quarter of 2006.  Net revenues were $2.5 billion for the 2007 first quarter, up 14% from $2.2 billion in the 2006 first quarter.

87.     Bear knew these results were false and misleading because the encouraging revenue growth and earnings per share it reported were made possible by the fact that Bear Stearns relied on misleading valuation models.  These models failed to reflect the declining value of its highly illiquid Level 3 assets, which at that point made up more than ten percent of its total assets.

88.     Bear followed up the release with an even more deceptive conference call.  On March 15, 2007, Bear Stearns held its first quarter 2007 earnings conference call, conducted by Bear's CFO, defendant Molinaro.  When Molinaro was asked by a caller whether he saw any trends in Bear's Value at Risk, Molinaro replied that there would be "No real change.  Should be about the

same." Molinaro, as CFO of Bear, knew at the time that Bear had been repeatedly warned by the SEC that its VaR numbers did not reflect omnipresent indicators of a rapidly declining housing market.

89.     Molinaro had to parry more questions during the March 15, 2007 call from analysts regarding Bear's subprime exposure. An analyst asked, "[D]id you take any write downs during the quarter and do you expect to as conditions have worsened?" Molinaro responded that the subprime market was a small part of Bear Stearns' overall business, and the Company had reduced the number of subprime mortgages it was purchasing and securitizing. Molinaro failed to explain that Bear was avoiding writing down its illiquid subprime-backed assets only by using inaccurate models to value them.

90.     On this same call, Molinaro was asked "[c]an you give any insight about whether you've seen or had issues with margin calls or any kind of difficulties in hedgefund-land given how volatile the Markets have been in the last few weeks?" In response, Molinaro said that Bear Stearn's hedge funds were having no issues with margin calls: "We haven't seen any difficulties. I would say it's been, obviously there's a lot of market volatility but we've had no difficulties here."

91.     In making this statement, Molinaro not only misrepresented the crisis facing the Hedge Funds, but failed to disclose Bear Stearns' exposure to the declining value of the subprime-backed Hedge Fund assets it held as collateral on its own books.

92.     Molinaro also stated in the March 15, 2007 call that Bear was well hedged in the market for subprime-backed securities. Because Molinaro understood that the VaR numbers Bear relied upon to calculate hedging ratios did not take housing market deterioration into account, he knew that these assurances were misleading.

93.     In fact, Molinaro actually boasted that the worsening outlook for housing would only increase the number of subprime-backed CDOs Bear would acquire.

> I think that the more likely scenario is there is going to be in dislocations like this, there's likely to be large bulk sales of assets, and certainly given the trouble that many companies have faced with their sub prime portfolios, there certainly would appear to be plenty of opportunity over the months and quarters ahead for that kind of activity.

94.     As a result of these deceptions Bear's quarterly results sent its stock up by $2.10, to close at $148.50.

### 4.     Misrepresentations and Omissions in Bear's April, 2007 10-Q

95.     On April 9, 2007, Bear Stearns filed its Form 10-Q for the quarterly period ended February 28, 2007.  In it, Defendants made various representations concerning Bear Stearns' risk management and mortgage-related operations.  Bear asserted, inter alia, that it valued its Level 3 assets using "internally developed models or methodologies utilizing significant inputs that are generally less readily observable from objective sources."

96.     However, Bear did not disclose that it knew that the models it was using for this valuation were outdated and inaccurate, and that it made no effort to review and update its valuation models.

97.     Bear claimed that it engaged in an "ongoing internal review of its valuations" and that "senior management from the Risk Management and Controllers Departments" are responsible for "ensuring that the approaches used to independently validate Bear's valuations are robust, comprehensive and effective."  In fact, Bear's risk management department was in chaos, and its chief of model review had quit Bear less than a month earlier.  It also knew that no substantive review of its mortgage valuation or value at risk models had even been undertaken—indeed, its mortgage-backed asset valuation models were more than a decade out of date.

98.     In the same filing, Bear continued to offer materially false and misleading Value at Risk numbers to investors, stating that, in the midst of the worst housing downturn in decades, its Value at Risk numbers had declined since Bear's last filing, to an aggregate level of $27.9 million, using a one-day interval and a 95% confidence level.

99.     Bear hastened to allay any skepticism about this strange result, insisting that "[t]he Company regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss."  It also stated that "[t]he Company utilizes a wide variety of market risk management methods, including trading limits; marking all positions to market on a daily basis; daily profit and loss statements; position reports; daily risk highlight reports; aged inventory position reports; and independent verification of inventory pricing."

100.    These statements were false and misleading, in that Bear had been repeatedly informed by the SEC that its VaR modeling did not reflect key market risks.  Moreover, Bear knew that it had made no effort to review or update these defective models, and that its risk managers had no power to constrain Bear's trading desk.

101.    The first quarter 2007 10-Q also stated that Bear's net revenues for Capital Markets increased 15.4% to $1.97 billion for the 2007 quarter and that its total assets at February 28, 2007 increased to $394.5 billion from $350.4 billion at November 30, 2006.  These statements were false and misleading, because Bear only avoided taking losses on its Level 3 assets by using improper valuation models.  This avoidance of loss permitted Bear to increase its reported revenues and asset values, inflating the value of its stock.

102.    Defendants Cayne and Molinaro once again certified these statements, stating that they had made efforts to ensure the accuracy of Bear's reporting and the reliability of its internal

controls.  Unbeknownst to Bear Stearns' investors, the scale of Bear's deception was about to get much larger.

> **5.      Misrepresentations and Omissions Regarding Bear's Book Value, the Adequacy of Bear's Liquidity and Capital Reserves, the Value of Bear's Assets, Bear's Financial Condition and Bear's Risk Management Following the Collapse of Bear's Hedge Funds**

103.    Bear created at least two highly leveraged hedge funds that invested heavily in subprime mortgage-backed securities:  The High-Grade Structured Credit Strategies Fund (the "Structured Credit Fund") in or about 2004 and the High-Grade Structured Credit Strategies Enhanced Leverage Fund (the "Enhanced Leverage Fund") in or about 2006 (together, the "Hedge Funds" or "the Funds").

104.    The Funds overvalued their mortgages, mortgage- and asset-backed securities and other derivative financial instruments.

105.    The rapid decline in the subprime mortgage market in early 2007 had devastating consequences for the Hedge Funds, which were heavily laden with subprime-backed assets.  The implosion of the Hedge Funds contributed directly to the even larger crisis that would befall Bear.

106.    As subprime mortgage risks materialized and subprime mortgage performance deteriorated during late 2006 and early 2007, the prices fetched by subprime loans on the secondary market (i.e., the prices obtained by securitizers such as Bear Stearns) fell.  The end result was that by March of 2007 subprime origination had almost entirely collapsed.

107.    On February 8, 2007, HSBC, the largest originator of subprime loans during 2006, raised its subprime loan loss reserves to $10.6 billion to cover anticipated losses from its subprime lending.  During a February 8, 2007 conference call, HSBC officials explained that ARM resets were set to explode, and that subprime borrowers likely would not be able to make

their payments when their rates rise. Not surprisingly, HSBC also announced plans to cut back on further subprime lending and to eliminate all stated income lending.

108.    HSBC's February 2007 announcement proved to be a turning point in the industry. The announcement made the scale of subprime risks widely apparent, and precipitated further and severe contraction in subprime origination. Moreover, it caused indices tracking the securities backed by subprime mortgages to fall precipitously.

109.    As the indices fell, capital rapidly receded from the subprime industry. With that withdrawal of capital, securitizers such as Bear Stearns found themselves increasingly unable to sell the subprime mortgages they repackaged to investors. The decreased demand for RMBS and CDOs created a chain reaction. Because the demand for RMBS and CDOs was decreasing, securitizer demand for subprime mortgages (to turn into RMBS) and for subprime RMBS (to turn into CDOs) was decreasing. Because securitizer demand for subprime mortgages was decreasing, subprime mortgage origination itself decreased.

110.    Rather than explain these difficult market conditions to investors, Bear Stearns Asset Management ("BSAM") misrepresented the Hedge Funds' subprime exposure to hedge fund investors in "Preliminary Performance Profiles" ("PPP"). For example, in monthly PPPs, BSAM represented that only 6- 8% of the Hedge Funds' assets were invested in subprime RMBS. However, unknown to the Hedge Funds' investors and the market, BSAM was only disclosing the Hedge Funds' direct subprime RMBS holdings. In fact, the Hedge Funds held tremendous amounts of subprime RMBS indirectly through the CDOs it had purchased.

111.    The Hedge Funds' large and undisclosed exposure to subprime assets placed enormous stress on the Hedge Funds as the subprime mortgage crisis accelerated. Returns in the subprime CDOs, and CDOs backed by slices of other CDOs, termed CDO-squares, diminished,

thus creating diminishing yield spreads, leading to accelerating losses for the Hedge Funds.  As a result, the High Grade Enhanced Fund experienced its first negative return in February 2007.

112.    In an email dated March 1, 2007, Ralph Cioffi, co-manager of the Hedge Funds, told BSAM managers not to "talk about [the February results] to anyone or I'll shoot you . . .  I can't believe anything has been this bad."

113.    Declines in the High Grade Hedge Fund soon followed, resulting in its first negative return in March of 2007.

114.    Because Bear Stearns had effectively bankrolled the Hedge Funds by giving them huge sums of cash in exchange for their subprime-backed collateral, the Hedge Funds' crisis had serious implications for Bear.  Notwithstanding the fact that Defendant Spector, Bear Stearns' Co-President, directly oversaw the Hedge Funds and understood the gravity of their situation, his CFO Molinaro denied the existence of any trouble.

115.    The Hedge Funds' situation continued to deteriorate throughout the Spring of 2007.  On April 19, 2007, Matthew M.  Tannin, Chief Operating Officer of the Hedge Funds, reviewed a credit model that showed increasing losses on subprime linked assets.  Tannin agreed with the model's assessment and, in an April 22, 2007 e-mail stated:

> IF we believe the runs [the analyst] has been doing are ANYWHERE CLOSE to accurate I think we should close the Funds now.  The reason for this is that if [the runs] are correct then the entire subprime market is toast … If AAA bonds are systematically downgraded then there is simply no way for us to make money- ever.

Tannin concluded that "caution would lead us to conclude the [CDO report] is right and we're in bad shape."

116.    By April 2007, Bear Hedge Funds' managers could no longer conceal the Hedge Funds' liquidity problems and turned to Bear for urgently needed financing.  Bear analyzed the

Funds' problems and entered into a bridge "repo loan" of approximately $290 million with the Enhanced Leverage Fund to help it temporarily address its expanding liquidity problems.

117.    On May 13, 2007, Tannin reiterated his earlier warning to another BSAM manager, stating that "I think [the Enhanced Leverage Hedge Fund] has to be liquidated."

118.    On or about May 15, 2007, Bear announced that the Enhanced Leverage Fund had lost 6.5% in April 2007.  Just three weeks later, Bear restated these losses to 19% in April and 23% for the year.

119.    Bear Stearns had reason to fear a liquidation of the Hedge Funds.  A forced "fire sale" of the thinly traded CDOs held by the Hedge Funds could compel Bear to acknowledge the huge declines in value in the subprime-backed assets it already held as collateral and as retained interests, and would also reveal the fact that Bear had been grossly overvaluing its Level 3 assets.  To avoid this, Bear became involved in an intense effort to prop up the Hedge Funds.

120.    Defendant Spector, Bear Stearns' Co-President, personally made the decision to extend a line of credit to the High Grade Hedge Fund.  He decided to let the High Grade Enhanced Fund fail, because its high leverage ratios left it virtually unsalvageable.  The purpose of the facility was to allow the High Grade Hedge Fund to liquidate in an orderly way by gradually selling assets into the market without having other assets seized by repurchase agreements counterparties, who would mark the assets to their true value.

121.    In the midst of this turmoil, on June 14, 2007, Bear Stearns issued a press release regarding its second quarter 2007 results.  In it, Bear continued to hide its mounting losses on Level 3 assets, permitting it to misrepresent its revenues and earnings per share.

122.    On June 22, 2007, Bear Stearns announced that it was entering into a $3.2 billion securitized financing agreement with the High Grade Hedge Fund in the form of a collateralized

repurchase agreement.  In exchange for lending the funds, Bear Stearns received as collateral

CDOs backed by subprime mortgages allegedly worth between $1.7 to $2 billion.  Pursuant to

the agreement, Bear Stearns gave up the right to collect all of the upside in the event that the

collateral saw a miraculous increase in value.

123.    During a Friday, June 22, 2007 conference call arranged to explain the bailout,

Defendant Molinaro, the CFO of Bear Stearns, took pains to explain that the Hedge Funds'

problems with their subprime-backed assets did not extend to the securities that Bear Stearns

itself held.  Molinaro failed to disclose that even prior to the bailout, Bear Stearns held large

amounts of the Hedge Funds' toxic debt as collateral.  Moreover, as a result of the bailout, Bear

Stearns had just taken on an enormous amount more of the same illiquid and devalued securities.

124.    During the June 22, 2007 conference call, Molinaro was asked: "To what extent has

this event caused you to relook at some of your practices overall for Bear Stearns since you are

such a big player in the mortgage market? I mean you have had the subprime problem for more

than three months now.  Are there other trigger events we should pay attention to over the next

year?"  Molinaro responded with the following:

> Well [] I don't know that it's causing us to have any different point of
> view on the activities in our mortgage business. *Our mortgage business
> has basically been not affected by this and has not really been a part of
> this situation.*  So our mortgage business continues to operate in a very
> effective way.  Albeit in a more in a lower volume environment and a
> more difficult operating environment given the macro picture in the
> marketplace.
>
> As it relates to our Asset Management division, we feel that we have
> adequate controls in place.  Obviously if you have a problem like this, you
> are going to reassess those controls and look to strengthen them.  But I
> think the simple point in this Fund is that or these two Funds, they are
> invested in an asset class that went through a period of severe distress.

125.    During the same June 22, 2007 conference call, an analyst asked Molinaro for his current sense of the broader impact of the losses being experienced by the BSAM funds. Molinaro stated:

> Well, I think clearly when you have a situation like this; it puts a lot of pressure on asset values and spreads in the marketplace. That's undoubtedly happening. I'm not expecting any material impact from that, at least as it relates to ourselves, can't speak to the broader market. *We're not seeing any material difficulties in repo lines or in counterparties who are having difficulty away from this meeting margin requirements. So, I would say, at least from our perspective, at the moment it appears to be relatively contained.*

(emphasis added).

126.    During the June 22, 2007 call, Mike Mayo, an analyst at Deutsche Bank, asked how Bear Stearns valued the collateral that it had received from the Hedge Funds. Molinaro stated that "the collateral values that we have are a reflection of the market value levels that we're seeing from our street counterparties." In fact, the market for such securities had become highly illiquid, providing no basis for Molinaro's statements.

127.    On June 26, 2007, defendant Cayne assured investors that "we see no material change in our risk profile or counterparty exposure as a result of the reaction in the marketplace regarding the situation surrounding these hedge funds." Bear's share prices increased as a result. Cayne's statement was materially false and misleading, in that the Company had effectively taken onto its books billions of dollars of worthless subprime-backed collateral, causing its risk exposure to grow enormously.

128.    According to Bear Stearns, by the end of June 2007, asset sales had reduced the loan balance to $1.345 billion, but the estimated value of the collateral securing the loan, the High Grade Hedge Fund's compromised CDOs, had deteriorated by nearly $350 million—that is, to

approximately the value of the loan Bear Stearns had given the High Grade Hedge Fund. Because the High Grade Hedge Fund had no other assets, any further declines in the value of the assets that Bear Stearns held as collateral would be borne directly by Bear Stearns.

129.    The 2008 Office of Inspector General ("OIG") Report concluded that, given these circumstances, Bear should have taken this collateral onto its own books and taken an immediate charge against net capital.  Instead of immediately reflecting its assumption of the declining collateral onto its books, Bear delayed doing so for months.  By doing so, the OIG stated, Bear Stearns was able "to delay taking a huge hit to capital."

130.    Collier and Sherman were  concerned by what they had learned from reports about the Hedge Funds' problems.  On or about July 3, 2007, Sherman had a phone conversation with Defendants Cayne and Spector about these developments and the extent of the danger they posed to Bear.

131.    Among other concerns, Sherman was concerned for Collier and other investors that if the Bear Hedge Funds' overvalued mortgages, mortgage and asset-backed securities and other derivative financial instruments had been purchased from Bear, Bear's own portfolio of mortgages, mortgage- and asset-backed securities and other derivative financial instruments was also overvalued. Sherman therefore asked Cayne and Spector whether the Bear Hedge Funds' mortgages, mortgage- and asset-backed securities and other derivative financial instruments were overvalued and if the Funds had purchased them from Bear.

132.    Cayne and Spector knew, but concealed from Collier and the investing public, that Bear materially over-valued its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments.