While AS 5 ¶ 19 modified this standard slightly for purposes of the 2007 audit, the significance of the control risk addressed by the risk management function at Bear Stearns called for Deloitte to continue to perform procedures to assess the effectiveness of the internal controls constituted by risk management.  Deloitte was required to consider its understanding of Bear's internal controls gained in prior periods for purposes of its 2007 audit.

419.    AS 2 ¶ 60 (AS 5 ¶ 28) required Deloitte to perform targeted procedures to assess the internal controls over financial reporting related to the financial statement assertions of significant accounts.  Bear Stearns' reported balance of financial instruments met the criteria of a significant account, which included the size and composition of the account, susceptibility of loss due to errors or fraud, accounting and reporting complexities associated with the account, and exposure to losses represented by the account.  (AS 2 ¶ 65, AS 5 ¶ 29).  Accordingly, Deloitte was required to consider, among other factors, whether effective internal controls existed to ensure that the reported valuation of Bear Stearns' financial instruments was appropriate.  (AS 2 ¶ 68, AS 5 ¶ 28).

420.    GAAS recognized audit risk stems in part from the "business risk that the institution does not properly understand the terms and economic substance of a significant complex investment.  Such misunderstandings could result in the incorrect pricing of a transaction and improper accounting for the investment or related income."  (D&L AAG 7.107). As implementation guidance, the D&L AAG notes that relevant control activities include:

(a)     Procedures exist to identify and monitor credit risk, prepayment risk, and impairment.

(b)     Current fair value of securities are obtained and reviewed on a timely basis.

(c)      Securities are monitored on an ongoing basis and factors affecting income recognition and the carrying amount of the securities are analyzed periodically to determine whether adjustments are necessary.

421.      The D&L AAG also provides guidance for independent accountants when testing internal controls.  It states (Ch.  7 Investments in Debt & Equity Securities ¶ 111):

422.      Control activities that would contribute to internal controls over financial reporting in this area include the maintenance of management policies, adopted by the board of directors or its investment committee, that establish authority and responsibility for investments in securities.

423.

424.      When reviewing such management policies, GAAS observes "…the independent accountant should be alert to potential abuses and override of policies and procedures when such circumstances exist."  (D&L AAG 7.113)

425.      Deloitte's internal controls testing should have addressed Bear's mortgage underwriting and securitization practices.  In doing so, Deloitte was on notice that it should take special care, as Bear Stearns was increasingly relying on non-conforming loans.  (D&L AAG Ch.  8, Loans).  This pattern was reflected in the growth of Bear Stearns' assets that were subject to management's subjective estimates.  These were the very types of investments explicitly identified in the ARAs as possessing higher degrees of inherent risk.  (2006 AAM 8050.35). Moreover, Deloitte should have been attuned to material industry and Bear Stearns specific risks such as:

(a)      The June 2006 meltdown of the Bear Stearns U.K.  subsidiary that specialized in subprime originations;

108

(b)      The observations of the housing market downturn by the National

Association of Realtors beginning in May 2006 described above; and

(c)      The FDIC reiteration that "Bankers and bank regulators need to remember

that rapid expansion in loan volumes often leads, over time, to declining credit quality."

426.    A close scrutiny of the Company's internal controls relating to its securitization

business should have placed Deloitte on notice that Bear Stearns was engaged in wrongdoing to

the detriment of its investors.  The OIG identified a:

> Lack of expertise by risk managers in mortgage-backed securities
> at various times; lack of timely formal review of mortgage models;
> persistent understaffing; a proximity of risk managers to traders
> suggesting lack of independence; turnover of key personnel during
> times of crisis; and an inability or unwillingness to update models
> quickly enough to keep up with changing circumstances.

427.    In addition, the 2008 OIG Report found "Bear Stearns' concentration of mortgage

securities was increasing for several years and was beyond its internal limits, and that a portion

of Bear Stearns' mortgage securities (i.e., adjustable rate mortgages) represented a significant

concentration of market risk…."  Accordingly, Deloitte should have been aware of the red flag

associated with the fact that Bear's holdings of MBS-related securities were in excess of its

internal policy limits.

428.    In addition to the above, Deloitte should have taken notice of the varying risk

management and pricing approaches taken by Bear Stearns' trading desks described at

paragraphs 200 to 202, above.  The B&D AAG observed that this practice constitutes a fraud risk

factor, which for purposes of Deloitte's audits of Bear Stearns should have become a red-flag.

**f.      Bear Stearns' Deficient Internal Audit Function**

429.    GAAS recognize that the internal audit function serves an important role in

monitoring the performance of an entity's controls.  (AU 322, The Auditor's Consideration of

the Internal Audit Function in an Audit of Financial Statements, ¶ 4).  Accordingly, GAAS states

"the auditor should obtain an understanding of the internal audit function sufficient to identify

those internal audit activities that are relevant to planning the audit."  (AU 322.04).

430.    Deloitte was subject to professional standards to evaluate the work performed by Bear

Stearns' internal auditors.  Specifically, when the work of internal auditors is used, the

independent auditor is required to evaluate:

> (a)    The competence of those internal auditors (AU 322.09);

> (b)    The procedures performed by internal audit to develop an understanding

of relevant internal controls (AU 322.13).

431.    GAAS further specify that when there is a high risk of misstatement, such as with the

valuation of assets, the external auditor is required to conduct its own testing.  The auditor is

similarly responsible for critical judgments such as inherent and control risks, and the materiality

of misstatements.

432.    In addition to the material weaknesses it observed with respect to Bear Stearns' risk

management function, the SEC concluded that there were significant deficiencies of the

Company's internal audit function.  These deficiencies were observed relative to Bear Stearns'

Internal Audit's assessment of risk management controls.  Importantly, this conclusion was

reached on a contemporaneous basis as set forth in the 2008 OIG Report:

> TM's own memorandum dated November 2006 noted significant
> deficiencies in Bear Stearns internal auditors' work as follows:
> The audits for Market Risk Management, Credit Risk Management
> and Funding/Liquidity Risk Management are completed and the
> reports are in draft form. *At this point it can be noted the [sic]*
> *there appears to be significant deficiencies in the coverage for*
> *the review of liquidity and funding risk management* which will
> be a focal point of our discussions of scope expansion in the 2007
> CSE audits.

(emphasis added).

433.    Given applicable professional standards, Deloitte should have similarly identified and addressed the red-flags constituted by the deficiencies in Bear Stearns' Internal Audit function. Deloitte should have been particularly sensitive to its review of the internal audit reports regarding Bear Stearns' risk management because Sarbanes-Oxley as originally drafted required the external auditor rather than internal auditors to perform this work.  In other words, applicable standards anticipated that greater levels of independence and expertise were likely to be necessary in the assessment of risk management than could be provided by internal audit personnel.

434.    Risk control at Bear Stearns was inextricably linked to the effectiveness of risk management and internal audit personnel as well as the procedures those functions carried out. In consideration of the significant deficiencies identified by the SEC, Deloitte should have known that Bear Stearns' internal audit function did not mitigate any of the shortcomings of the Company's risk management function.  Critically, the ineffectiveness of Bear Stearns' oversight functions raised red-flags about the Company's internal controls and commitment to the effective risk management operations it was reporting to users of its financial statements.

## ADDITIONAL SCIENTER ALLEGATIONS

435.    As alleged herein, each of the Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in Bear's name were materially false and misleading when made, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements and documents as primary violators of the federal securities law and common law of the State of New York.

436.    Defendants Cayne and Spector each had the opportunity to commit and participate in the wrongful conduct complained of herein.  Each was a senior executive officer and/or director of Bear and thus controlled the information disseminated to the investing public in Bear's press releases, SEC filings and communications with analysts and investors.  As a result, each could falsify the information that reached the public about Bear's business and performance.

**James E.  Cayne**

437.    As Chairman of the Board and Chief Executive Officer of Bear, Defendant Cayne participated in the issuance of, signed, and certified Bear's materially false and misleading SEC filings, as required by Sarbanes-Oxley, issued through the relevant period.

438.    Specifically, in connection with Bear's 2006 10-K and Bear's 10-Q for each quarter of 2007, Cayne certified that he had put in place disclosure controls and procedures to ensure the accuracy of Bear's filings, and that he had:

> Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others with in those entities, particularly during the period in which this report is being prepared[.]

439.    Also in connection with Bear's Form 10-K for 2006 and 2007 and the Form 10-Q for all quarters of 2007 and the first quarter of 2008, Cayne certified that he had:

> Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles[.]

112

440.    These disclosure controls, together with his position as Bear's CEO, meant that throughout the relevant period Cayne was aware that the Bear had been warned by the SEC that Bear's mortgage valuation models failed to reflect key indicators in the housing market.

441.    Cayne knew, or was reckless in not knowing, the SEC had warned Bear at least as early as December 2005 that "Bear Stearns used outdated models that were more than ten years old to value mortgage derivatives and had limited documentation on how the models worked." 2008 OIG Report, Ex. A, at 20.

442.    Cayne knew, or was reckless in not knowing, that Bear's valuation models were not reviewed since the SEC's warning in 2005. See 2008 OIG Report, Ex. A, at 23. Further, Cayne knew, or was reckless in not knowing, that Bear's valuation models did not even incorporate measures to take into account declines in housing prices until "towards the end of 2007." Id. at 27.

443.    Accordingly, Cayne knew, or was reckless in not knowing, that Bear's valuation of its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments was based on outdated and inaccurate models and that Bear had materially overvalued those assets.

444.    Since Cayne knew that the adequacy of Bear's liquidity and capital reserves depended on the value of Bear's assets, Cayne had access to information showing and he knew, or was reckless in not knowing, that Defendants' statements regarding Bear's liquidity and capital reserves were materially inaccurate.

445.    Cayne also knew of Bear's stated reliance on GAAP accounting but ignored or recklessly disregarded GAAP accounting requirements. For example, Cayne was aware of the FAS 157 requirement to accurately mark values to their market prices, and was further aware

that Bear was not in compliance because it had used flawed and outdated and inaccurate models which rendered Bear's financial statements false and misleading.  Likewise, Cayne was aware that, given Bear's material overstatement of the value of its assets and Bear's tremendous leverage, Bear's capital cushion was inadequate in the event that creditors made margin calls caused by declining asset values.

446.   Defendant Cayne was motivated during the relevant period to misrepresent the public material facts about Bear's risk management and true financial condition, including the value of Bear's assets and the sufficiency of Bear's liquidity and capital reserves, in order to keep the stock price artificially high while he sold his own shares at a profit.

447.   Notwithstanding Defendant Cayne's duty not to sell Bear common stock under these circumstances, or to disclose his non-public, inside information prior to selling his stock, Defendant Cayne sold Bear stock during the relevant period at prices that were artificially inflated by Defendants' materially false and misleading statements and omissions.

448.   During the relevant period, Cayne sold more than 219,000 shares of Bear stock at prices artificially inflated by Defendants' misrepresentations and omissions described herein, resulting in proceeds to Cayne of over $23 million.

449.   Alternatively, Cayne made his materially false and misleading statements and omissions through negligence.

**Warren Spector**

450.   As Co-President and Co-Chief Operating Officer of Bear, Defendant Spector participated in the issuance of Bear's materially false and misleading SEC filings issued through the relevant period and signed Bear's 2006 10-K.

451.    During his tenure as Co-President and Co-Chief Operating Officer, all divisions of Bear except investment banking reported to Spector, including Bear's mortgage business and the Bear Hedge Funds.  Spector was Bear's leading expert in valuing and trading mortgages, mortgage- and asset-backed securities and other derivative financial instruments.

452.    Spector knew, or was reckless in not knowing, that the SEC had warned Bear at least as early as December 2005 that "Bear Stearns used outdated models that were more than ten years old to value mortgage derivatives and had limited documentation on how the models worked."  2008 OIG Report, Ex. A, at 20.

453.    Spector knew, or was reckless in not knowing, that Bear's valuation models were not reviewed since the SEC's warning in 2005.  2008 OIG Report, Ex. A, at 23.  Further, Spector knew, or was reckless in not knowing, that Bear's valuation models did not even incorporate measures to take into account declines in housing prices until "towards the end of 2007."  Id. at 27.

454.    Accordingly, Spector knew, or was reckless in not knowing, that Bear's valuation of its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments was based on outdated and inaccurate models and that Bear had materially overvalued those assets.

455.    Since Spector knew that the adequacy of Bear's liquidity and capital reserves depended on the value of Bear's assets, Spector had access to information showing and he knew, or was reckless in not knowing, that Defendants' statements regarding Bear's liquidity and capital reserves were materially inaccurate.

456.    Spector also knew of Bear's stated reliance on GAAP accounting but ignored or recklessly disregarded GAAP accounting requirements.  For example, Spector was aware of the

FAS 157 requirement to accurately mark values to their market prices, and was further aware that Bear was not in compliance because it had used flawed, outdated and inaccurate models which rendered Bear's financial statements false and misleading. Likewise, Spector was aware that, given Bear's material overstatement of the value of its assets and Bear's tremendous leverage, Bear's capital cushion was inadequate in the event that creditors made margin calls caused by declining asset values.

457.   Defendant Spector was motivated during the relevant period to misrepresent the public material facts about Bear's risk management and true financial condition, including the value of Bear's assets and the sufficiency of Bear's liquidity and capital reserves in order to keep the stock price artificially high while he sold his own shares at a profit.

458.   Notwithstanding Defendant Spector's duty not to sell Bear common stock under these circumstances, or to disclose his non-public, inside information prior to selling his stock, Defendant Spector sold Bear stock during the relevant period at prices that were artificially inflated by Defendants' materially false and misleading statements and omissions.

459.   During the relevant period, Spector sold more than 116,000 shares of Bear stock at prices artificially inflated by Defendants' misrepresentations and omissions described herein, resulting in proceeds to Spector of over $19 million.

460.   Alternatively, Spector made his materially false and misleading statements and omissions through negligence.

**Alan D. Schwartz**

461.   As Chief Executive Officer, Co-President, Co-Chief Operating Officer, and director of Bear Stearns, Defendant Schwartz participated in the issuance of, and signed and certified as accurate and complete as required by Sarbanes-Oxley, Bear Stearns' materially false and

misleading SEC filings issued during the relevant period. Schwartz became sole President on August 5, 2007, and remained in that position until January of 2008, when he replaced Cayne as CEO. Throughout the relevant period, Defendant Schwartz signed Bear's materially false and misleading Forms 10-K for the 2006 and 2007 fiscal years.

462. According to a February 8, 2008 presentation by Molinaro to a Credit Suisse Financial Services Forum, Schwartz, Bear's CEO, was "intimately engaged in the risk management process." Accordingly, Schwartz was aware that Bear had twice been warned by the SEC that its mortgage valuation and risk modeling failed to reflect key indicators in the housing market. Despite this knowledge, Schwartz signed SEC filings setting out, among other things, the value of level three assets and Bear's VaR.

463. Moreover, Schwartz offered false reassurances to the public while Bear's liquidity plummeted the week of March 10, 2008. On March 10, 2008, Bear's liquidity pool had stood at $18.1 billion. By the close of March 11, 2008, it had declined to $11.5 billion - a one-day loss of more than $6 billion.

464. Feeling pressure to dupe the market into that Bear Stearns did not have a liquidity problem, Schwartz appeared on CNBC the morning of March 12, 2008. As alleged in paragraph 233, above, Schwartz stated, "We finished the year, and we reported that we had $17 billion of cash sitting at the bank's parent company as a liquidity cushion. As the year has gone on, that liquidity cushion has been virtually unchanged." Schwartz added, "We don't see any pressure on our liquidity, let alone a liquidity crisis."

465. The next day, Bear's liquidity stood at about $2 billion. Accordingly, while Schwartz was speaking, nearly ten billion dollars of liquidity was evaporating from Bear Stearns.

117

466.    Moreover, Schwartz also knew, or was reckless in not knowing, that Bear Stearns' counterparties were deserting Bear.  As alleged in paragraphs 231 and 232, above, ING Groep NV informed Bear Stearns that it was pulling about $500 million in financing; banks were refusing to issue any further credit protection on Bear's debt; and Goldman Sachs, once a principal source of cash for Bear, had at least temporarily halted covering any more Bear Stearns risk.  This in turn led other Bear Stearns counterparties to refuse to lend to Bear.

467.    Moreover, as Bear's CEO, Schwartz knew or was reckless in not knowing that on March 6, 2008, Rabobank Group, one of Bear Stearns' European lenders, told the brokerage that it wouldn't renew a $500 million loan coming due later that week.

468.    Schwartz knew, or was reckless in not knowing, that the SEC had warned Bear at least as early as December 2005 that "Bear Stearns used outdated models that were more than ten years old to value mortgage derivatives and had limited documentation on how the models worked."  2008 OIG Report, Ex. A, at 20.

469.    Schwartz knew, or was reckless in not knowing, that Bear's valuation models were not reviewed since the SEC's warning in 2005.  2008 OIG Report, Ex. A, at 23.  Further, Schwartz knew, or was reckless in not knowing, that Bear's valuation models did not even incorporate measures to take into account declines in housing prices until "towards the end of 2007."  Id. at 27.

470.    Accordingly, Schwartz knew, or was reckless in not knowing, that Bear's valuation of its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments was based on outdated and inaccurate models and that Bear had materially overvalued those assets.

471.    Since Schwartz knew that the adequacy of Bear's liquidity and capital reserves depended on the value of Bear's assets, Schwartz had access to information showing and he knew, or was reckless in not knowing, that Defendants' statements regarding Bear's liquidity and capital reserves were materially inaccurate.

472.    Schwartz also knew of Bear's stated reliance on GAAP accounting but ignored or recklessly disregarded GAAP accounting requirements.  For example, Schwartz was aware of the FAS 157 requirement to accurately mark values to their market prices, and was further aware that Bear was not in compliance because it had used flawed, outdated and inaccurate models which rendered Bear's financial statements false and misleading.  Likewise, Schwartz was aware that, given Bear's material overstatement of the value of its assets and Bear's tremendous leverage, Bear's capital cushion was inadequate in the event that creditors made margin calls caused by declining asset values.

473.    Alternatively, Schwartz made his materially false and misleading statements and omissions through negligence.

**Samuel L. Molinaro, Jr.**

474.    As Chief Financial Officer during the relevant period, and as of August 5, 2007 Chief Operating Officer of Bear Stearns, Defendant Molinaro participated in the issuance of, signed and certified as accurate and complete as required by the Sarbanes-Oxley Act, Bear Stearns' materially false and misleading SEC filings issued during the relevant period.

475.    Specifically, in connection with the Forms 10-K for 2006 and 2007, Molinaro certified that he had put in place disclosure controls and procedures to ensure the accuracy of the Company's filings, and that he had:

> [d]esigned such disclosure controls and procedures, or caused
> such disclosure controls and procedures to be designed under our

119

> supervision, to ensure that material information relating to the
> registrant, including its consolidated subsidiaries, is made known
> to us by others within those entities, particularly during the period
> in which this report is being prepared.

476.    Also in connection with the Forms 10-K for 2006 and 2007 Molinaro certified  that

he had:

> [d]esigned such internal control over financial reporting, or
> caused such internal control over financial reporting to be
> designed under our supervision, to provide reasonable assurance
> regarding the reliability of financial reporting and the preparation
> of financial statements for external purposes in accordance with
> generally accepted accounting principles[.]

477.    Moreover, according to a February, 2008 presentation given by Molinaro himself to

Credit Suisse analysts, Bear's risk management structure reported directly to him.

478.    Molinaro knew, or recklessly disregarded, that Bear Stearns' internal controls were

virtually non-existent with respect to risk management over MBS valuation and VaR.  As CFO

of Bear and the head of its risk management structure, Molinaro knew about, or recklessly

disregarded the existence of, the SEC's warnings about serious deficiencies in Bear's mortgage

valuation and VaR models.  During Bear's CSE application process, the SEC told Principal

Accounting Officer Jeffrey Farber – Molinaro's direct report – that "[w]e believe that it would

be highly desirable for independent Model Review to carry out detailed reviews of models in the

mortgage area."  These concerns were again communicated to Bear in a December 2, 2005

memorandum from the SEC Office of Compliance Inspections and Examinations ("OCIE") to

Farber.  The disclosure controls and procedures that Molinaro purportedly put in place would

have or should have informed him that the SEC found Bear's risk management metrics deficient.

479.    The degree to which the SEC Inspector General found Bear Stearns' internal controls to be deficient raises the strong inference that Molinaro could not have believed, or recklessly disregarded the truth of, his Sarbanes-Oxley Act certification of Bear's internal controls.

480.    As Bear Stearns' CFO, and COO starting August 5, 2007, Defendant Molinaro participated in the issuance of, signed and certified Bear Stearns' materially false and misleading SEC filings as accurate and complete, as required by Sarbanes-Oxley.  During the relevant period, Molinaro signed and certified Bear Stearns' Form 10-Qs and Form 10-Ks filed with the SEC, and throughout the relevant period, Molinaro conducted quarterly earnings conference calls with shareholders and investors and made a number of materially false and misleading statements regarding Bear Stearns' ABS exposure as well as its risk-monitoring infrastructure.

481.    As Bear Stearns' CFO, Molinaro was responsible for monitoring Bear Stearns' internal controls and reporting Bear's risks.  In an investment bank such as Bear Stearns, a CFO must be fully aware of the bank's own securities because the CFO is responsible for obtaining the financing to purchase them.  Therefore, Molinaro could not have been ignorant about the existence, size and nature of Bear Stearns risky positions without having been reckless in his ignorance.  As the CFO of a major investment bank, Molinaro was acutely aware of the Fair Value reporting requirements and had purportedly implemented them at Bear Stearns.  During the relevant period, Molinaro knowingly and recklessly caused Bear Stearns to issue and file financial statements and reports with the SEC that stated that Bear Stearns had implemented accounting standards in line with GAAP requirements when, in fact, Bear Stearns was not complying with GAAP through its failure to accurately value the MBS and CDOs it carried on its books.

482.    Thus, while Molinaro was assuring analysts and the market that Bear Stearns had not suffered from any adverse marks in the mortgage area and its hedging activities, he knew or was reckless in not knowing that Bear Stearns was heavily exposed to deteriorating market conditions.

483.    Subsequent to the Hedge Funds' collapse, on November 14, 2007, Molinaro stated that Bear Stearns would write down $1.2 billion of its subprime holdings in the fourth quarter. However, Molinaro attempted to reassure investors by claiming that, in spite of the fact that Bear Stearns still bore more than a billion dollars of subprime exposure in the form of the collateral it had received from the failed High Grade Fund, Bear Stearns had reduced its CDO holdings to $884 million as of November 9, 2007 from $2.07 billion at the end of August 2007.

484.    Molinaro knew, or was reckless in not knowing, that the SEC had warned Bear at least as early as December 2005 that "Bear Stearns used outdated models that were more than ten years old to value mortgage derivatives and had limited documentation on how the models worked." 2008 OIG Report, Ex. A, at 20.

485.    Molinaro knew, or was reckless in not knowing, that Bear's valuation models were not reviewed since the SEC's warning in 2005.  2008 OIG Report, Ex. A, at 23.  Further, Molinaro knew, or was reckless in not knowing, that Bear's valuation models did not even incorporate measures to take into account declines in housing prices until "towards the end of 2007." Id. at 27.

486.    Accordingly, Molinaro knew, or was reckless in not knowing, that Bear's valuation of its retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments was based on outdated and inaccurate models and that Bear had materially overvalued those assets.

487.    Since Molinaro knew that the adequacy of Bear's liquidity and capital reserves depended on the value of Bear's assets, Molinaro had access to information showing and he knew, or was reckless in not knowing, that Defendants' statements regarding Bear's liquidity and capital reserves were materially inaccurate.

488.    Molinaro claimed that during the period between August 31, 2007 and November 9, 2007, Bear significantly increased its short subprime exposure.  However, Molinaro knew, or was reckless in not knowing, that Bear Stearns' valuation models could not accurately value the CDO and subprime exposure which he was allegedly "disclosing" to the market.  It became further apparent to Molinaro that the figures disclosed to the market were inaccurate when, notwithstanding Molinaro's assurance just weeks before that Bear's hedging efforts had resulted in a net negative exposure to subprime assets, on December 20, 2007, Bear wrote down $1.9 billion of its holdings in mortgages and mortgage-based securities – over $700 million more than it had announced on November 14, 2007.  On November 14, 2007, Molinaro knew this additional write down was necessary, or was reckless in not knowing.

489.    As CFO, Molinaro also knew of Bear Stearns' stated reliance on GAAP accounting and banking standards such as the Basel II Standards but either ignored them or recklessly disregarded them.  For example, Molinaro was aware of the SFAS 157 requirement to accurately mark values to their market prices, but was aware that Bear Stearns had flawed models for doing so which necessarily rendered its financial statements false and misleading.

490.    Alternatively, Molinaro made his materially false and misleading statements and omissions through negligence.

123

**Bear Stearns**

491.    The cumulative knowledge of all of Bear's agents, including Defendants Cayne and

Spector, is imputed to Bear.

492.    The facts alleged in this Complaint create a strong inference that one or more of

Bear's officers acted knowingly or recklessly in violating the federal securities laws and the

common law of the State of New York.

493.    For example, at least as early as 2005 in a memo to Jeffrey M.  Farber, then a Senior

Managing Director and Bear's Controller and Principal Accounting Officer, the SEC had

criticized Bear for using "outdated models that were more than ten years old to value mortgage

derivatives and [for having] limited documentation on how the models worked."  2008 OIG

Report, Ex. A, at 20.  Defendant Cayne was "intimately engaged" in Bear's risk management

process and Defendant Spector was Bear's leading expert in valuing and trading mortgages,

mortgage- and asset-backed securities and other derivative financial instruments, Defendant

Molinaro was CFO throughout the relevant period and Defendant Schwartz was Bear's CEO in

2008.  All were apprised of the SEC's criticism of Bear's mortgage valuation models.  Despite

this, Bear knowingly or recklessly continued to use such models and issued materially false or

misleading public statements regarding the value of its assets and its liquidity and capital

reserves, as set forth herein.

494.    Further, neither Bear nor its agents corrected or updated the materially false and

misleading representations they had disseminated to the market, despite Bear's and its agents'

knowledge of Bear's risk management and true financial condition, including the value of Bear's

assets and the sufficiency of Bear's liquidity and capital reserves.

495.    Alternatively, Bear made his materially false and misleading statements and
omissions through negligence.

**Deloitte & Touche LLP**

496.    The Sarbanes-Oxley Act established the Public Company Accounting Oversight
Board (the "PCAOB"), which is responsible for the development of auditing practice standards.
The PCAOB adopted Generally Accepted Auditing Standards ("GAAS"), which are required to
be followed by registered public accounting firms.

497.    Deloitte was required to perform an audit of Bear in accordance with PCAOB
Auditing Standards.  Among other things, Deloitte was charged with evaluating Bear's fair value
measurements.  Deloitte knowingly or recklessly disregarded several red flags with respect to
valuation, including the fact that Bear continued to use valuation models that the SEC had
repeatedly criticized as inaccurate and outmoded, and that ignored home price depreciation.

498.    Alternatively, Deloitte was negligent in performing their audit of Bear.

499.    For purposes of both its 2006 and 2007 audits, GAAS required Deloitte to evaluate
Bear's assumptions used in determining fair value.

500.    GAAS required Deloitte to, among other things:

    a.    test Bear's processes for preparing fair value measurements and the
reasonableness, relevance and timeliness of the information, assumptions,
inputs and models;

    b.    evaluate whether the fair value measurements were consistent with market
information, were determined using an appropriate model, and included
relevant information that was reasonably available at the time;

    c.    identify assumptions that had high sensitivities on valuation including
whether any sensitive assumptions had been excluded from the valuation
process;

    d.    test whether reliance on historical financial information relied on in Bear's
valuation models was justified;

  e. test the pricing models to compute the reported fair value Bear's retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments; and

  f. assess whether Bear Stearns' assumptions were reasonable and reflected market-based information.

501. In October 2007, the Center for Audit Quality published an audit alert entitled "Measurements of Fair Value in Illiquid (Or Less Liquid) Markets," which noted:

> The level of defaults has, in many cases, exceeded the model-based projections originally used to structure and assign ratings to securities backed by subprime mortgage loans...and holders of existing loans and mortgage-backed securities have experienced sharp declines in their value.

502. Thus, by the time Deloitte undertook its 2007 audit of Bear, Deloitte was well aware that it needed to pay particularly close attention to Bear's valuation models for financial instruments.

503. Specifically, Deloitte was confronted with significant red flags relating to Bear's valuation of Bear's retained mortgages, mortgage- and asset-backed securities and other derivative financial instruments. As set forth above, Bear Stearns had been warned by the SEC at least as early as 2005 that Bear's valuation models were materially deficient. According to the 2008 OIG Report, Bear failed to review its outdated and inaccurate models or, until the end of 2007, to reflect home price depreciation in its mortgage valuation models.

504. In light of the warnings by the Center for Audit Quality, warnings by the SEC and Deloitte's audit of Bear's assumptions used in determining fair value of Bear's mortgages, mortgage- and asset-backed securities and other derivative financial instrument, Deloitte knew, or was reckless or negligent in not knowing, that its statement, among others, that Bear's "basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein" was materially false and misleading.

126

505. Alternatively, Deloitte subsequently learned, or was reckless or negligent in not learning, that its statements in Bear's 2007 10-K and other filings were materially false or misleading when made without taking reasonable steps to correct or withdraw its opinion.

506. In conducting its audit, Deloitte either deliberately, recklessly, or negligently disregarded the fact that the SEC had already warned Bear of these problems.

## LOSS CAUSATION

507. The material misrepresentations and omissions by Defendants detailed above (at, for example, paragraphs 38 to 215) fraudulently concealed Bear's deterioration and Bear's vulnerability to changing market circumstances as a result of its poor financial condition and risk management. Defendants' material misrepresentations and omissions fraudulently overstated the value of Bear's assets and Bear's liquidity and capital reserves, among other things, thereby creating and maintaining artificially inflated prices for Bear common stock.

508. Defendants' misrepresentations and omissions that were not immediately followed by an upward movement in the prices of Bear common stock served to maintain the price of Bear common stock at artificially inflated levels by maintaining and supporting the false, positive perception of Bear's risk management and financial condition, including the value of Bear's assets and Bear's liquidity and capital reserves.

509. Defendants had a duty to promptly disseminate accurate and truthful information about Bear's risk management and financial condition, including the value of Bear's assets and its liquidity and capital reserves, and to promptly correct or update any information they had previously disseminated that was materially false or misleading. As a result of Defendants' failures to do so, the price of Bear common stock was artificially inflated, directly causing Plaintiffs to suffer damages when the price of Bear common stock fell significantly due to partial

disclosures on dates including June 22, 2007, July 18, 2007, September 20, 2007, November 14, 2007, December 20, 2007, March 14, 2008, and March 16, 2008, as set forth below.

510.   Defendants' materially false and misleading statements and omissions in their press releases, SEC filings and other statements concealed Bear's poor risk management and true financial condition, that, as and when it was disclosed, negatively affected the value of Bear stock.  Defendants' materially false and misleading statements and omissions were the proximate cause of losses suffered by Plaintiffs.

*June 22, 2007 Partial Corrective Disclosure*

511.   On June 22, 2007, Bear issued a press release attached to a Form 8-K filed June 26, 2007, in which Bear announced a plan to provide a loan of $3.2 billion to Bear's Structured Credit Fund, explaining that Bear's Hedge Funds "have had difficulty in creating necessary liquidity and working capital to continue to operate the Funds" as a result of the declining value of their mortgage-related assets.

512.   Bear's June 22, 2007 disclosure of its substantial loan to the Structured Credit Fund indicated that Bear's own assets, like those of the Bear Hedge Funds, might also be declining in value and worth less than Bear had reported with the result that Bear would have similar "difficulty in creating necessary liquidity and working capital to continue to operate," especially since Bear was devoting significant capital to propping up the Structured Credit Fund.  This was a partial corrective disclosure with respect to the Defendants' prior false and misleading statements concerning Bear's risk management and financial condition, including the value of its assets and its capital and liquidity reserves.

513.    As a consequence of Bear's June 22, 2007 partial corrective disclosure, Bear stock dropped more than 4.5%, falling from its June 21, 2007 close at $145.81 to close at $139.10 on June 25, 2007.

514.    This loss, which was caused by the June 22, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiffs would have sustained as a result of ordinary market forces.

*July 18, 2007 Partial Corrective Disclosure*

515.    On July 18, 2007, Bear disclosed in a letter to investors that Bear's Enhanced Leverage Fund had lost all of its value, while there was "very little value" left in the Structured Credit Fund.

516.    Bear's July 18, 2007 disclosure of the collapse in value of the Bear Hedge Funds indicated that Bear's own holdings of mortgages, mortgage- and asset-backed securities and other derivative financial instruments might also be of declining value and worth less than Bear had reported.  This was a partial corrective disclosure with respect to the Defendants' prior false and misleading statements concerning Bear's risk management and financial condition, including the value of its assets and its capital and liquidity reserves.

517.    As a consequence of Bear's July 18, 2007 partial corrective disclosure, Bear stock dropped more than 22.5%, falling from its July 17, 2007 close at $139.91 to close at $108.35 on August 3, 2007.

518.    This loss, which was caused by the July 18, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiffs would have sustained as a result of ordinary market forces.

*September 20, 2007 Partial Corrective Disclosure*

519.     On September 20, 2007, Bear Stearns issued a press release and filed a Form 8-K

announcing financial results for the quarter ended August 31, 2007 in which Bear reported a 61%

drop in net income and a 38% drop in net revenues.

520.     Bear's September 20, 2007 disclosure of its precipitous drop in net income and

revenues indicated that Bear's assets were declining in value and generating less liquidity and

capital than anticipated.  This was a partial corrective disclosure with respect to the Defendants'

prior false and misleading statements concerning Bear's risk management and financial

condition, including the value of its assets and its capital and liquidity reserves.

521.     As a consequence of Bear's September 21, 2007 partial corrective disclosure, Bear

stock dropped approximately 2.3%, falling from its September 19, 2007 close at $115.64 to close

at $112.99 on September 24, 2007.

522.     This loss, which was caused by the September 20, 2007 partial corrective disclosure,

was dramatically larger, to a statistically significant extent, than any losses Plaintiffs would have

sustained as a result of ordinary market forces.

*November 14, 2007 Partial Corrective Disclosure*

523.     On November 14, 2007, Molinaro made a presentation at the Merrill Lynch Banking

and Financial Services Investor Conference in which he announced that Bear expected to take a

$1.2 billion write-down on its mortgage and collateralized debt obligation portfolios.  This news

was also included in a Form 8-K Bear filed November 15, 2007.

524.     Bear's November 14, 2007 disclosure of its $1.2 billion write-down, which revealed

that Bear's assets were declining in value and worth less than Bear had reported and that Bear's

capital and liquidity reserves were diminished, was a partial corrective disclosure with respect to

the Defendants' prior false and misleading statements concerning Bear's risk management and financial condition, including the value of its assets and its capital and liquidity reserves.

525.    As a consequence of Bear's November 14, 2007 partial corrective disclosure, Bear stock dropped more than 11.7%, falling from its November 14, 2007 close at $103.45 to close at $91.28 a week later on November 21, 2007.

526.    This loss, which was caused by the November 14, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiffs would have sustained as a result of ordinary market forces.

### December 20, 2007 Partial Corrective Disclosure

527.    On December 20, 2007, Bear issued a press release announcing the financial results for the quarter and fiscal year ended November 30, 2007.  In that press release, which Bear attached to its Form 8-K filed December 21, 2007, Bear announced that it was increasing its write-downs by almost 60%, from $1.2 billion announced on November 14, 2007 to $1.9 billion and announced its first quarterly loss in Bear's 84-year history.

528.    Bear's December 20, 2007 disclosure of the sharp jump in its write-downs, which revealed that Bear's assets were declining in value and worth less than Bear had reported and that Bear's capital and liquidity reserves were diminished, was a partial corrective disclosure with respect to the Defendants' prior false and misleading statements concerning Bear's risk management and financial condition, including the value of its assets and its capital and liquidity reserves.

529.    As a consequence of Bear's December 20, 2007 partial corrective disclosure, Bear stock dropped more than 22%, falling from its December 20, 2007 close at $91.42 to close at $71.21 on January 8, 2008.

131

530.    This loss, which was caused by the December 20, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiffs would have sustained as a result of ordinary market forces.

*March 14, 2008 Partial Corrective Disclosure*

531.    On March 14, 2008, Bear announced that its liquidity position had significantly deteriorated, requiring Bear to seek financing through a secured loan facility from JPMorgan.

532.    Bear's March 14, 2008 disclosure of its desperate liquidity position was a partial corrective disclosure with respect to the Defendants' prior false and misleading statements concerning Bear's risk management and financial condition, including its capital and liquidity reserves.

533.    As a consequence of Bear's March 14, 2008 partial corrective disclosure, Bear stock dropped 47.7%, falling from its March 13, 2008 close at $57.35 to close at $29.99 on March 14, 2008 on heavy trading of approximately 187 million shares.

534.    This loss, which was caused by the March 14, 2008 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiffs would have sustained as a result of ordinary market forces.

*March 16, 2008 Partial Corrective Disclosure*

535.    On March 16, 2008, Bear announced that it would be acquired by JPMorgan for $2 per share.

536.    Bear's March 16, 2008 disclosure that JPMorgan would pay only $2 per share, which revealed Bear's dire financial condition and that Bear's assets were worth far less than Bear had reported, was a partial corrective disclosure with respect to the Defendants' prior false and

misleading statements concerning Bear's risk management and financial condition, including the value of its assets and its capital and liquidity reserves.

537.   As a consequence of Bear's March 16, 2008 partial corrective disclosure, Bear stock dropped 84%, falling from its March 14, 2008 close at $29.99 to close at $4.78 on March 17, 2008 on heavy volume of over 166 million shares.

538.   This loss, which was caused by the March 16, 2008 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses Plaintiffs would have sustained as a result of ordinary market forces.

**PRESUMPTION OF RELIANCE:**
**<u>FRAUD-ON-THE-MARKET</u>**

539.   As a result of the actions alleged above, the market price of Bear's common stock was artificially inflated.

a.      At all relevant times, the market for Bear's common stock was an efficient market for the following reasons, among others: Bear securities met the requirements for listing and were listed and actively traded on the New York Stock Exchange, a highly efficient market;

b.      as a regulated issuer, Bear filed periodic public reports with the SEC;

c.      Bear regularly communicated with public investors through established market communication mechanisms, including regular dissemination of press releases on major newswire services and other wide-ranging public disclosures, such as communications with the financial press;

d.      the market reacted to the public information disseminated by Bear;

e.      securities analysts employed by brokerage firms followed Bear and wrote publicly available reports about the company that were distributed to the sales force and to

133

customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public market place;

    f. the material representations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Bear securities; and

    g. without knowledge of the misrepresented or omitted material facts, Collier purchased Bear securities between the time Defendants made the material misrepresentations and omissions and the time the fraudulent scheme was being disclosed, during which time the price of Bear securities was inflated by Defendants' misrepresentations and omissions.

540. As a result, the market for Bear securities efficiently digested current information regarding the company from all publicly available sources and reflected such information in the price of the company's securities.  In ignorance of the false and misleading representations and omissions by Defendants described above, Collier relied, to its damage, on the integrity of the market as to the value of Bear's securities and acquired them at an artificially inflated price.  At the time of the acquisition of Bear stock by Collier, the true fair market value of the securities was substantially less than the purported fair market value due to Bear's material misrepresentations and omissions.

## NO SAFE HARBOR

541. Defendants cannot escape liability for their misrepresentations and omissions by resort to statutory safe harbor provided for forward-looking statements.  The statements alleged to be false or misleading in this Complaint relate to facts and conditions existing at the time the statements were made.  Moreover, to the extent Defendants may now seek to characterize any of these statements as "forward looking", they were not identified as "forward-looking" statements when they were made.  Nor were the statements accompanied by any meaningful cautionary

statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent the statutory safe harbor does apply to any forward-looking statement alleged herein, Defendants are liable for those statements because at the time each one was made, the particular speaker had actual knowledge that the particular statement was false, and/or the statement was authorized and/or approved by an executive officer of Bear who knew that the statement was false when made.

## V.    CLAIMS FOR RELIEF

### Count I

### (Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5—Manipulative and Deceptive Devices)

542.    This Count is brought on behalf of the Purchasing Collier Entities.

543.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

544.    Defendants disseminated or approved the untrue statements described above, which were misleading in that they contained material misrepresentations or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendants knew, or were reckless in not knowing, that their statements were untrue and misleading when made.

545.    Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

       (a)    employed devices, schemes and artifices to defraud;

       (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

135

(c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with their purchases of Bear securities.

546.    Plaintiffs have suffered damages in that, in reliance upon the integrity of the market, they paid artificially inflated prices for Bear securities, prices which subsequently declined when the underlying weaknesses concealed by Defendants' misrepresentations and omissions were revealed, thereby damaging Plaintiffs.  Plaintiffs would not have purchased Bear securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

547.    The underlying problems at Bear concealed by Defendants' misrepresentations and omissions were the proximate cause of the significant fall in Bear's stock price that caused Plaintiffs harm as and when the truth about Bear's problems was finally disclosed to the market.

## Count II

### (Section 18 of the Securities Exchange Act of 1934—Misleading Statements)

548.    Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth herein.  For purposes of this Count only, Plaintiffs assert only negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

549.    Defendants made or caused to be made untrue statements described above in documents filed pursuant to the Securities Exchange Act of 1934 or regulations promulgated thereunder.

550.    For example, Defendants made or caused to be made untrue statements in Bear's 2006 and 2007 Form 10-K filings as set forth in, for example, paragraphs 59 to 72 and 192 to 211, above, including Deloitte's causing the incorporation by reference of its unqualified

opinions on Bear's financial statements for fiscal years 2006 and 2007 as set forth in, for example, paragraphs 344 to 352, above.

551.    Plaintiffs have suffered damages in that, in reliance upon the Defendants' materially false and misleading statements in documents filed pursuant to the Securities Exchange Act of 1934 or regulations promulgated thereunder as set forth above, Plaintiffs purchased Bear securities at prices which had been artificially inflated as a result of those false and misleading statements, prices which subsequently declined when the underlying weaknesses concealed by Defendants' misrepresentations and omissions were revealed, thereby damaging Plaintiffs. Plaintiffs would not have purchased Bear common securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

552.    The underlying problems at Bear concealed by Defendants' misrepresentations and omissions were the proximate cause of the significant fall in Bear's stock price that caused Plaintiffs harm as and when the truth about Bear's problems was disclosed to the market.

553.    Collier exercised due diligence in reading Bear's Forms 10-K and 10-Q filed immediately before Collier began investing in Bear and all those filed during the time that Collier continued to have an investment in Bear.

554.    Despite Collier's diligence, and because the underlying wrongs were self-concealing, it could not and did not discover its cause of action prior to publication of the 2008 OIG Report on September 25, 2008.

## COUNT III

### (Section 20 of the Securities Exchange Act of 1934—Control Persons)

137

555.    Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth herein.

556.    The Individual Defendants acted as controlling persons of Bear within the meaning of § 20(a) of the Exchange Act.  By reason of their positions with Bear, and their ownership of Bear stock, the Individual Defendants had the power and authority to cause Bear to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled Bear and all of its employees and were culpable participants in Bear's securities fraud.  By reason of such conduct, Defendants are liable pursuant to § 20(a) of the Exchange Act.

557.    As set forth above, Bear and the Individual Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to § 20(a) of the Exchange Act.

558.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs suffered damages in connection with its purchases and sales of Bear securities in that, as a result of Defendants' false and misleading statements, Plaintiffs paid artificially inflated prices for Bear securities, prices which subsequently declined as and when the underlying weaknesses concealed by Defendants' misrepresentations and omissions were revealed, thereby damaging Plaintiffs.

## Count IV

### (Common Law Fraud)

559.    Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth herein.

560.    The representations by Defendants alleged herein regarding the adequacy of Bear's liquidity and capital reserves, Bear's risk management, Bear's financial condition and the value of Bear's assets were false, as revealed by Bear's collapse as a result of these factors.

561.    Defendants knew their misrepresentations and omissions as to Bear's risk management and financial condition, including the value of Bear's assets and the sufficiency of Bear's liquidity and capital reserves, were false.

562.    Alternatively, in light, inter alia, of Bear's precarious capital position, portfolio of improperly valued mortgages, mortgage- and asset-backed securities and other derivative financial instruments, deteriorating reputation, the failure of its hedge funds, its commitment to those failed funds and its significant exposure to markets actually, and widely perceived to be, deteriorating, Defendants had no reasonable foundation for their representations regarding Bear's risk management and financial condition, including the value of Bear's assets and the sufficiency of Bear's liquidity and capital reserves, and recklessly made the representations identified in this Complaint.

563.    All of Defendants' misrepresentations and omissions concerned facts that were peculiarly within the knowledge of Defendants and which were not readily available to Plaintiffs. As Defendants' knew, as a result of Defendants' misrepresentations and omissions, Plaintiffs were acting under mistaken beliefs about these material facts.  Defendants breached their duty by failing to disclose the truth to Plaintiffs.

564.    Defendants sometimes deceived Plaintiffs through partial or ambiguous statements that information available to Defendants rendered materially misleading.  Defendants breached their duty by failing to disclose that information to Plaintiffs.

565.   Defendants intended and reasonably expected that their misrepresentations and omissions would cause Plaintiffs to increase or retain their Bear investments, desist from further inquiry and remain passive.  As a result of the misrepresentations and omissions alleged in this Complaint, Plaintiffs lost the opportunity to investigate Bear's problems and to evaluate the steps Defendants were taking to address them.

566.   As a result of these misrepresentations and omissions, Defendants deceived Plaintiffs regarding Bear's risk management and financial condition, including the value of Bear's assets and the sufficiency of Bear's liquidity and capital reserves, and thereby intentionally transformed Plaintiffs' indecision about whether to sell or keep their Bear investments into damaging decisions to retain or increase their Bear investments.

567.   Plaintiffs decided to purchase and retain their Bear securities in justifiable reliance on Defendants' fraudulent misrepresentations and omissions.

568.   Defendants' misrepresentations and omissions alleged herein deceived Plaintiffs and denied Plaintiffs the opportunity to investigate Bear's problems and the steps, if any, Defendants were taking to address them.

569.   If Defendants had not made the misrepresentations and omissions alleged in this Complaint, Plaintiffs would not have purchased additional Bear securities.

570.   If Defendants had not made the misrepresentations and omissions alleged in this Complaint, Plaintiffs would have sold all or a substantial amount of their Bear investments.

571.   The underlying weaknesses concealed by Defendants' misrepresentations and omissions were the proximate cause of the significant fall in Bear's stock price that caused Plaintiffs harm as and when the truth about Bear's problems was disclosed to the market.

572.   By virtue of the material misrepresentations and omissions alleged herein, Defendants are liable to Plaintiffs for damages for actual and/or constructive fraud under the common law of the State of New York in an amount to be determined at trial.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

(a)   awarding Plaintiffs damages for all injuries suffered as a result of Defendants' wrongdoing;

(b)   awarding Plaintiffs prejudgment interest at the maximum rate allowable by law;

(c)   awarding Plaintiffs such other and further relief as they may show themselves justly entitled.

### Demand for Jury Trial

Plaintiffs hereby demand a trial by jury.

Dated: __11/26/__, 2014

Respectfully submitted,

BOIES SCHILLER & FLEXNER LLP

By: _____

Philip Korologos
575 Lexington Avenue
New York, NY 10022
Phone: (212) 446-2300
Fax: (212) 446-2350

Richard B. Drubel
Matthew J. Henken
BOIES, SCHILLER & FLEXNER LLP
26 South Main Street
Hanover, NH 03755
Phone: (603) 643-9090
Fax: (603) 643-9010

George A. Zelcs
KOREIN TILLERY LLC
205 North Michigan Plaza
Suite 1950
Chicago, IL 60601
Phone: (312) 641-9750
Direct: (312) 641-9760
Fax: (312) 641-9751

Stephen M. Tillery
Aaron M. Zigler
Robert L. King
KOREIN TILLERY LLC
505 North 7th Street,
Suite 3600
St. Louis, MO 63101
Phone: (314) 241-4844
Fax: (314) 241-3525

*Attorneys for Plaintiffs*