# EXHIBIT A



U.S. Securities and Exchange Commission

# Office of Inspector General

Office of Audits

# SEC's Oversight of Bear Stearns and Related Entities:

# The Consolidated Supervised Entity Program



September 25, 2008
Report No. 446-A

The SEC believes this report contains non-public and confidential Information



**OFFICE OF
INSPECTOR GENERAL**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C.  20549

September 25, 2008

**To:**     Chairman Christopher Cox
Erik Sirri, Director, Division of Trading and Markets
Lori Richards, Director, Office of Compliance Inspections and
     Examinations
John White, Director, Division of Corporation Finance
Jonathan Sokobin, Director, Office of Risk Assessment

**From:**   H. David Kotz, Inspector General

**Subject:**   Audit of *SEC's Oversight of Bear Stearns and Related Entities: The
Consolidated Supervised Entity Program*, Report No. 446-A

This memorandum transmits the Securities and Exchange Commission, Office of
Inspector General's (OIG) final report detailing the results of our audit on the
SEC's Oversight of Bear Stearns and Related Entities: The Consolidated
Supervised Entity Program.  This audit was conducted pursuant to a
Congressional request from Ranking Member Charles E. Grassley of the United
States Senate Committee on Finance.

The final report consists of 26 recommendations that are addressed primarily to
the Division of Trading and Markets (TM).  Recommendations 18 and 25 are also
addressed to the Office of Compliance Inspections and Examinations (OCIE) and
Recommendation 19 is also addressed to the Office of Risk Assessment (ORA).
Recommendations 20 and 21 are addressed to the Division of Corporation
Finance (CF), Recommendation 17 is addressed to CF and TM, and
Recommendation 22 is addressed to Chairman Cox.

In response to the draft report, responsible management officials agreed with 21
out of 26 recommendations.  TM concurred with 20 of 23 recommendations
addressed to them and disagreed with Recommendations 13, 15, and 16.  OCIE
concurred with both recommendations addressed to them.  CF concurred with
Recommendation 17, but disagreed with Recommendations 20 and 21.

Your written responses to the draft report, dated August 18, 2008, are included in
their entirety in Appendices VI and VII.  In addition, OIG's response to Chairman
Cox's and Management's comments are included in Appendix VIII.

Should you have any questions regarding this report, please do not hesitate to contact me.  During this audit we appreciate the courtesy and cooperation that you and your staff extended to our auditors.

Attachment

cc:     Peter Uhlmann, Chief of Staff, Chairman's Office
        Diego Ruiz, Executive Director, Office of the Executive Director
        Brian Cartwright, General Counsel, Office of General Counsel
        Andrew Donohue, Director, Division of Investment Management
        John Nester, Director Office of Public Affairs
        William Schulz, Office of Legislative and Intergovernmental Affairs
        Bob Colby, Deputy Director, TM
        Daniel Gallagher, Deputy Director, TM
        Shelley Parratt, Deputy Director, CF
        Michael Macchiaroli, Associate Director, TM
        Mary Ann Gadziala, Associate Director, OCIE
        Matthew Eichner, Assistant Director, TM
        John Walsh, Chief Counsel, OCIE
        Thomas K. McGowan, Assistant Director, TM
        Herb Brooks, Assistant Director, TM
        William Lenox, Ethics Counsel, Office of General Counsel
        Denise Landers, Legal Counsel, TM
        Juanita Bishop Hamlett, Branch Chief, OCIE
        Darlene L. Pryor, Management Analyst, Office of the Executive Director
        Other staff who participated in the audit

        Rick Hillman, Managing Director of Financial Markets and Community
           Investment, GAO

# The CSE Program (Including Reviews Performed on Bear Stearns)

## Executive Summary

**Background.** During the week of March 10, 2008, rumors spread about liquidity problems at The Bear Stearns Companies, Inc. (Bear Stearns).[1] As the rumors spread, Bear Stearns was unable to obtain secured financing from counterparties. This caused severe liquidity problems. As a result, on Friday March 14, 2008, JP Morgan Chase & Co. (JP Morgan) provided Bear Stearns with emergency funding from the Federal Reserve Bank of New York (FRBNY).[2] According to Congressional testimony,[3] after the markets closed on March 14, 2008, it became apparent that the FRBNY's funding could not stop Bear Stearns' downward spiral. As a result, Bear Stearns concluded that it would need to file for bankruptcy protection on March 17, 2008, unless another firm purchased it. On Sunday March 16, 2008, (before the Asian markets opened), Bear Stearns' sale to JP Morgan was announced with financing support from the FRBNY. In May 2008, the sale was completed.

Because Bear Stearns had collapsed, at the time of our fieldwork, there were six holding companies in the Securities and Exchange Commission's (Commission) Consolidated Supervised Entity (CSE) program. In addition to Bear Stearns, these six holding companies include or included Goldman Sachs Group, Inc. (Goldman Sachs), Morgan Stanley, Merrill Lynch & Co. (Merrill Lynch), Lehman Brothers Holdings Inc. (Lehman Brothers), Citigroup Inc. and JP Morgan. On September 15, 2008, Lehman Brothers announced that it would file for bankruptcy protection and Bank of America announced that it agreed to acquire Merrill Lynch.[4] Both firms had experienced serious financial difficulties. Finally, on September 21, 2008, the Board of Governors of the Federal Reserve System (Federal Reserve) approved, pending a statutory five-day antitrust waiting period, applications from Goldman Sachs and Morgan Stanley to become bank holding companies with the Federal Reserve as their new principal regulator. As a result, the future of the CSE program is uncertain.

---

[1] See Acronyms used in Appendix I.
[2] The funding was from the Federal Reserve Bank of New York (FRBNY) through JP Morgan Chase & Co. (JP Morgan) to The Bear Stearns Companies, Inc. (Bear Stearns) because JP Morgan, unlike Bear Stearns, could borrow money from the FRBNY.
[3] Timothy Geithner (President and Chief Executive Officer, FRBNY) and Alan Schwartz (President and Chief Executive Officer of Bear Stearns) before U.S. Senate Committee on Banking, Housing and Urban Affairs on Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators dated April 3, 2008.
[4] The audit fieldwork was completed prior to these events on September 15, 2008.

Of the seven original CSE firms, the Commission exercised direct oversight over only five firms (Bear Stearns, Goldman Sachs, Morgan Stanley, Merrill Lynch, and Lehman Brothers), which did not have a principal regulator. The Commission does not directly oversee Citigroup Inc. and JP Morgan because these firms have a principal regulator, the Federal Reserve.

The CSE program is a voluntary program that was created in 2004 by the Commission pursuant to rule amendments under the Securities Exchange Act of 1934.[5] This program allows the Commission to supervise these broker-dealer holding companies on a consolidated basis. In this capacity, Commission supervision extends beyond the registered broker-dealer to the unregulated affiliates of the broker-dealer to the holding company itself. The CSE program was designed to allow the Commission to monitor for financial or operational weakness in a CSE holding company or its unregulated affiliates that might place United States regulated broker-dealers and other regulated entities at risk.

A broker-dealer becomes a CSE by applying to the Commission for an exemption from computing capital using the Commission's standard net capital rule, and the broker-dealer's ultimate holding company consenting to group-wide Commission supervision (if it does not already have a principal regulator). By obtaining an exemption from the standard net capital rule, the CSE firms' broker-dealers are permitted to compute net capital using an alternative method. The Commission designed the CSE program to be broadly consistent with the Federal Reserve's oversight of bank holding companies.

Bear Stearns' main activities were investment banking, securities and derivatives sales and trading, clearance, brokerage and asset management. Bear Stearns was highly leveraged with a large exposure (*i.e.,* concentration of assets) in mortgage-backed securities. Bear Stearns had less capital and was less diversified than several of the other CSE firms.

The Commission stated that Bear Stearns' unprecedented collapse was due to a liquidity crisis caused by a lack of confidence. Chairman Christopher Cox described Bear Stearns as a well-capitalized and apparently fully liquid major investment bank that experienced a crisis of confidence, denying it not only unsecured financing, but short-term secured financing, even when the collateral consisted of agency securities with a market value in excess of the funds to be borrowed.[6]

---

[5] Source: Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities (69 Fed Reg. 34.428). Securities and Exchange Commission (Commission). 21 June 2004.
<http://www.sec.gov/rules/final/34-49830.htm>.

[6] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before United states (U.S.) Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

**Congressional Request.** On April 2, 2008, the Office of Inspector General (OIG) received a letter from Ranking Member Charles E. Grassley of the United States Senate Committee on Finance, requesting that the OIG analyze the Commission's oversight of CSE firms and broker-dealers subject to the Commission's Risk Assessment Program.[7] This letter noted that the Commission's Division of Trading and Markets (TM) was responsible for regulating the largest broker-dealers, and their associated holding companies. The letter requested a review of TM's oversight of the five CSE firms it directly oversees, with a special emphasis on Bear Stearns. The letter requested that the OIG analyze how the CSE program is run, the adequacy of the Commission's monitoring of Bear Stearns, and make recommendations to improve the Commission's CSE program.

The United States Senate Committee on Finance letter also requested that the OIG provide an update of findings made in its previous audit report on the Commission's Broker-Dealer Risk Assessment Program (*Broker-Dealer Risk Assessment Program*, Report no. 354, issued on August 13, 2002).[8]

**Audit Objectives.** In response to the April 2, 2008 Congressional Request, the OIG conducted two separate audits with regard to the Commission's oversight of Bear Stearns and related entities. This audit's objectives were to evaluate the Commission's CSE program, emphasizing the Commission's oversight of Bear Stearns and to determine whether improvements are needed in the Commission's monitoring of CSE firms and its administration of the CSE program.

The OIG performed a second audit on the Commission's Broker-Dealer Risk Assessment Program to follow up on the current status of recommendations made in the OIG's prior audit report of the Risk Assessment Program (*Broker-Dealer Risk Assessment Program*, Report no. 354, issued on August 13, 2002) and to examine the Broker-Dealer Risk Assessment program to determine whether improvements are needed. The Commission's Risk-Assessment program tracks the filing status of 146 broker-dealers that are part of a holding company structure and have at least $20 million in capital. The Risk Assessment Program report found that TM is not fulfilling its obligations in accordance with the underlying purpose of the Broker-Dealer Risk Assessment program in several respects. TM has failed to update and finalize the rules governing the program, TM has not enforced the filing requirement incumbent on broker-dealers, resulting in the failure of nearly one-third of the required firms to file 17(h) documents, TM has not yet determined whether the two remaining Bear Stearns' broker-dealers are obligated to file Form 17-H, and TM only

---

[7] A copy of this request letter is attached to this report in full in Appendix II.

[8] The U.S. Senate Committee on Finance letter also requested that the Office of Inspector General (OIG) conduct an investigation into the facts and circumstances surrounding the Commission's decision not to pursue an Enforcement Action against Bear Stearns. This issue will be addressed in an OIG investigative report to be issued on September 30, 2008.

conducts an in-depth review of the filings for six of the 146 filing firms that TM determined are most significant, based on their free credit balances and customer accounts.  Audit report number 446-B examining the Commission's Risk Assessment program contains 10 recommendations and was issued on September 25, 2008.

**Retention of an Expert.**  Given the complexity of the subject matter, the OIG retained an expert, Albert S. (Pete) Kyle to provide assistance with this audit. Professor Kyle joined the University of Maryland faculty as the Charles E. Smith Chair Professor of Finance at the Robert H. Smith School of Business in August 2006.  He earned a Bachelor of Science degree in Mathematics from Davidson College in 1974, studied Philosophy and Economics at Oxford University as a Rhodes Scholar and completed his Ph.D. in Economics at the University of Chicago in 1981.  He was a professor at Princeton University's Woodrow Wilson School from 1981-1987, at the University of California's Haas Business School in Berkeley from 1987-1992, and at Duke University from 1992-2006.

Professor Kyle is a renowned expert on many aspects of capital markets, with a particular focus on market microstructure.  He has conducted significant research on such topics as informed speculative trading, market manipulation, price volatility, and the information content of market prices, market liquidity, and contagion.  His paper "Continuous Auctions and Insider Trading" (Econometrica, 2005) is one of the mostly highly cited papers in theoretical asset pricing.

Professor Kyle was elected a Fellow of the Econometric Society in 2002.  He was also a board member of the American Finance Association from 2004-2006.  He served as a staff member of the Presidential Task Force on Market Mechanisms (Brady Commission), after the stock market crash of 1987.  During his career, he has worked as a consultant on finance topics for several government agencies, in addition to the Commission, including the Department of Justice, the Internal Revenue Service, the Federal Reserve and the Commodity Futures Trading Commission.

Professor Kyle's Curriculum Vitae appears in Appendix III of this report.

In this audit, Professor Kyle analyzed TM's oversight of the CSE firms, with a particular focus on Bear Stearns.  Professor Kyle reviewed TM's internal memoranda on the CSE firms, which documented TM's assessment of the CSE firms' operations and reviewed data in the CSE firms' monthly and quarterly CSE program filings.

From this information, Professor Kyle analyzed the firms' financial data, holdings, risk management strategies, tolerance for risk and assessed the adequacy of the firms' filings.  In particular, Professor Kyle analyzed Bear Stearns' capital, liquidity, and leverage ratios, access to secured and unsecured financing, and its

compliance with industry and worldwide standards such as the Basel Standards.[9] Professor Kyle analyzed how TM supervised or oversaw Bear Stearns' mortgage-backed securities portfolio, its use of models to measure risk, the adequacy of its models, its model review process, the relationship between its traders and risk management department, and its risk-management scenarios. Professor Kyle also examined how TM supervised Bear Stearns' internal operations, including its funding of two prominent hedge funds that collapsed in the summer of 2007.

**Audit Conclusions and Results.**  The CSE program's mission (goal) provides in pertinent part as follows:

> The regime is intended to allow the Commission to monitor for, and act quickly in response to, financial or operational weakness in a CSE holding company or its unregulated affiliates that might place regulated entities, including US and foreign-registered banks and broker-dealers, *or the broader financial system at risk.*[10] [Emphasis added]

Thus, it is undisputable that the CSE program failed to carry out its mission in its oversight of Bear Stearns because under the Commission and the CSE program's watch, Bear Stearns suffered significant financial weaknesses and the FRBNY needed to intervene during the week of March 10, 2008, to prevent significant harm to the broader financial system.[11]

This audit was not intended to be a complete assessment of the multitude of events that led to Bear Stearns' collapse, and accordingly, does not purport to demonstrate any specific or direct connection between the failure of the CSE Program's oversight of Bear Stearns and Bear Stearns' collapse.  However, we have identified serious deficiencies in the CSE program that warrant improvements.  Overall, we found that there are significant questions about the adequacy of a number of CSE program requirements, as Bear Stearns was

---

[9] "The Basel Committee on Banking Supervision (Basel Committee) seeks to improve the quality of banking supervision worldwide, in part by developing broad supervisory standards. The Basel Committee consists of central bank and regulatory officials from 13 member countries: Belgium, Canada, France, Germany, Italy, Japan, Luxembourg, the Netherlands, Spain, Sweden, Switzerland, United Kingdom, and United States. The Basel Committee's supervisory standards are also often adopted by nonmember countries." Source: Government Accountability Office. Bank Regulators Need to Improve Transparency and Overcome Impediments to Finalizing the Proposed Basel II Framework. Report No. 07-253, February 15, 2007.

[10] Source: SEC [Commission] Consolidated Supervision of Broker-Dealer Holding Companies Program Overview and Assessment Criteria.  Commission. 16 Mar 2007. <http://www.sec.gov/divisions/marketreg/cseoverview.htm>.

[11] The Commission established criteria (the link is provided below) for measuring the success of the Consolidated Supervised Entity (CSE) program.  While the CSE program may have been successful in achieving its established criteria, none of the criteria standards directly related to the failure of a CSE firm and its effect on the broader financial system (as stated in the CSE program's goal statement). Source: SEC [Commission] Consolidated Supervision of Broker-Dealer Holding Companies Program Overview and Assessment Criteria.  Commission. 16 Mar 2007.

compliant with several of these requirements, but nonetheless collapsed.  In addition, the audit found that TM became aware of numerous potential red flags prior to Bear Stearns' collapse, regarding its concentration of mortgage securities, high leverage, shortcomings of risk management in mortgage-backed securities and lack of compliance with the spirit of certain Basel II standards, but did not take actions to limit these risk factors.

In addition, the audit found that procedures and processes were not strictly adhered to, as for example, the Commission issued an order approving Bear Stearns to become a CSE prior to the completion of the inspection process. Further, the Division of Corporation Finance (CF) did not conduct Bear Stearns' most recent 10-K filing review in a timely manner.

The audit also identified numerous specific concerns with the Commission's oversight of the CSE program, some of which are summarized as follows:[12]

(a)   Bear Stearns was compliant with the CSE program's capital and liquidity requirements;[13] however, its collapse raises questions about the adequacy of these requirements;

(b)   Although TM was aware, prior to Bear Stearns becoming a CSE firm, that Bear Stearns' concentration of mortgage securities was increasing for several years and was beyond its internal limits, and that a portion of Bear Stearns' mortgage securities (e.g., adjustable rate mortgages) represented a significant concentration of market risk, TM did not make any efforts to limit Bear Stearns' mortgage securities concentration;

(c)   Prior to the adoption of the rule amendments which created the CSE program, the broker-dealers affiliated with the CSE firms were required to either maintain:

- A debt to-net capital ratio of less than 15 to 1(after their first year of operation); or

- Have net capital not less than the greater of $250,000 or two percent of aggregate debit items computed in accordance with the *Formula for Determination of Reserve Requirements for Broker-Dealers.*

However, the CSE program did not require a leverage ratio limit for the CSE firms.  Furthermore, despite TM being aware that Bear Stearns' leverage was high, TM made no efforts to require Bear

---

[12] We have no specific evidence indicating whether any of these issues directly contributed to Bear Stearns' collapse since our audit scope did not include a determination of the cause of Bear Stearns' collapse (see Appendix IV).
[13] As discussed in the Scope and Methodology section (see Appendix IV), we did not independently verify (*i.e.,* recalculate and determine the accuracy) Bear Stearns' capital or liquidity amounts.

Stearns to reduce its leverage, despite some authoritative sources describing a linkage between leverage and liquidity risk;

(d) TM became aware that risk management of mortgages at Bear Stearns had numerous shortcomings, including lack of expertise by risk managers in mortgage-backed securities at various times; lack of timely formal review of mortgage models; persistent understaffing; a proximity of risk managers to traders suggesting a lack of independence; turnover of key personnel during times of crisis; and the inability or unwillingness to update models to reflect changing circumstances. Notwithstanding this knowledge, TM missed opportunities to push Bear Stearns aggressively to address these identified concerns;

(e) There was no documentation of discussions between TM and Bear Stearns of scenarios involving a meltdown of mortgage market liquidity, accompanied by a fundamental deterioration of the mortgages themselves. TM appeared to identify the types of risks associated with these mortgages that evolved into the subprime mortgage crisis yet did not require Bear Stearns to reduce its exposure to subprime loans;

(f) Bear Stearns was not compliant with the spirit of certain Basel II standards and we did not find sufficient evidence that TM required Bear Stearns to comply with these standards;

(g) TM took no actions to assess Bear Stearns' Board of Directors' and senior officials' (*e.g.,* the Chief Executive Officer) tolerance for risk although we found that this is a prudent and necessary oversight procedure;

(h) TM authorized (without an appropriate delegation of authority) the CSE firms' internal audit staff to perform critical audit work involving the risk management systems instead of the firms' external auditors as required by the rule that created the CSE program;

(i) In June 2007, two of Bear Stearns' managed hedge funds collapsed. Subsequent to this collapse, significant questions were raised about some of Bear Stearns' senior managements' lack of involvement in handling the crisis. However, TM did not reassess the communication strategy component of Bear Stearns' Contingency Funding Plan (CFP) after the collapse of the hedge funds, and very significant questions were once again raised about some of Bear Stearns' managements' handling of the crisis during the week of March 10, 2008;

(j) The Commission issued four of the five Orders approving firms to use the alternative capital method, and thus become CSEs (including Bear Stearns) before the inspection process was completed; and

(k)     CF did not conduct Bear Stearns' most recent 10-K filing review in a timely manner.  The effect of this untimely review was that CF deprived investors of material information that they could have used to make well-informed investment decisions (*i.e.,* whether to buy/sell Bear Stearns' securities).  In addition, the information (*e.g.,* Bear Stearns' exposure to subprime mortgages) could have been potentially beneficial to dispel the rumors that led to Bear Stearns' collapse.

**Recommendations.** We identified 26 recommendations (see Appendix V) that should significantly improve the Commission's oversight of CSE firms.  Chairman Cox's and Management's comments are attached in Appendix VI and VII, respectively.  Our recommendations include:

(a)     A reassessment of guidelines and rules regarding the CSE firms' capital and liquidity levels;

(b)     Taking appropriate measures to ensure that TM adequately incorporates a firm's concentration of securities into the CSE program's assessment of a firm's risk management systems and more aggressively prompts CSE firms to take appropriate actions to mitigate such risks;

(c)     A reassessment of the CSE program's policy regarding leverage ratio limits;

(d)     Ensuring that: (1) the CSE firms have specific criteria for reviewing and approving models used for pricing and risk management, (2) the review and approval process conducted by the CSE firms is performed in an independent manner by the CSEs' risk management staff, (3) each CSE firm's model review and approval process takes place in a thorough and timely manner, and (4) limits are imposed on risk taking by firms in areas where TM determines that risk management is not adequate;

(e)     Being more skeptical of CSE firms' risk models and working with regulated firms to help them develop additional stress scenarios that have not already been contemplated as part of the prudential regulation process;

(f)     Greater involvement on the part of TM in formulating action plans for a variety of stress or disaster scenarios, even if the plans are informal;

(g)     Taking steps to ensure that mark disputes do not provide an occasion for CSE firms to inflate the combined capital of two firms by using inconsistent marks;

(h)     Encouraging the CSE firms to present Value at Risk and other risk management data in a useful manner, which is consistent with how

the CSE firms use the information internally and allows risk factors to be applied consistently to individual desks;

(i)     Ensuring (in accordance with Basel II) that the Consolidated Supervised Entities take appropriate capital deductions for illiquid assets and appropriate capital deductions for stressed repos, especially stressed repos where illiquid securities are posted as collateral;

(j)     Greater discussion of risk tolerance with the CSE firms' Boards of Directors and senior management to better understand whether the actions of CSE firms' staff are consistent with the desires of the Boards of Directors and senior management;

(k)     Requiring compliance with the existing rule that requires external auditors to review the CSE firms' risk management control systems or seek Commission approval in accordance with the Administrative Procedures Act for this deviation from the current rule's requirement;

(l)     Ensuring that reviews of a firm's CFP includes an assessment of a CSE firm's internal and external communication strategies;

(m)    Developing a formal automated process to track material issues identified by the monitoring staff to ensure they are adequately resolved;

(n)     Ensuring that they complete all phases of a firm's inspection process before recommending that the Commission allow any additional CSE firms the authority to use the alternative capital method;

(o)     Improving collaboration efforts among TM, CF, the Office of Compliance Inspections and Examination (OCIE), and the Office of Risk Assessment (ORA);

(p)     The development by CF of internal guidelines for reviewing filings timely and tracking and monitoring compliance with its internal guidelines; and

(q)     The creation of a Task Force led by ORA with staff from TM, the Division of Investment Management, and OCIE to perform an analysis of large firms with customer accounts that hold significant amounts of customer funds and have unregulated entities, to determine the costs and benefits of supervising these firms on a consolidated basis.

The final report consists of 26 recommendations that are addressed primarily to the Division of Trading and Markets (TM).  Recommendations 18 and 25 are also addressed to the Office of Compliance Inspections and Examinations (OCIE) and Recommendation 19 is also addressed to the Office of Risk Assessment (ORA). Recommendations 20 and 21 are addressed to the Division of

Corporation Finance (CF), Recommendation 17 is addressed to CF and TM, and Recommendation 22 is addressed to Chairman Cox.

In response to the draft report, responsible management officials agreed with 21 out of 26 recommendations.  TM concurred with 20 of 23 recommendations addressed to them and disagreed with Recommendations 13, 15, and 16.  OCIE concurred with both recommendations addressed to them.  CF concurred with Recommendation 17, but disagreed with Recommendations 20 and 21.

# TABLE OF CONTENTS

Executive Summary.................................................................................... iv

Table of Contents .................................................................................... xiv

Background and Objectives......................................................................... 1

Findings and Recommendations ............................................................... 10

    Finding 1: Bear Stearns Was Compliant With The CSE
    Program's Capital Ratio And Liquidity Requirements, But The
    Collapse Of Bear Stearns Raises Questions About The
    Adequacy Of These Requirements ......................................................... 10
        Capital ............................................................................................... 10
            Adequacy of Capital Levels.................................................... 10
            Increased Access to Secured Financing............................. 11
            Recommendation 1 .................................................................. 13

        Liquidity ............................................................................................ 14
        Recommendation 2 ......................................................................... 17

    Finding 2: TM Did Not Adequately Address Several Significant
    Risks That Impact The Overall Effectiveness Of The CSE
    Program.................................................................................................. 17
        Concentration of Assets ................................................................. 17
        Recommendation 3 ......................................................................... 18

        Leverage........................................................................................... 19
        Recommendation 4 ......................................................................... 20

        Bear Stearns Model Review Process and Risk
        Management Staffing Were Inadequate In The Area Of
        Mortgage Backed Securities............................................................ 20
        Recommendation 5 ......................................................................... 24

        Risk Scenarios ................................................................................ 24
        Recommendation 6 ......................................................................... 27
        Recommendation 7 ......................................................................... 27

        Non-compliance With Basel II.......................................................... 27
            Mark Disputes .......................................................................... 27
            Recommendation 8 .................................................................. 29

        Inconsistent VaR Numbers.............................................................. 29
        Recommendation 9 ......................................................................... 29

Bear Stearns' Capital Requirements for Illiquid Assets and Stressed Repos Require Careful Oversight ........................................................ 29
Recommendation 10 .............................................. 33

Tolerance for Risk .................................................. 33
Recommendation 11 .............................................. 33

Finding 3: TM, Without Explicit Authority, Allowed The CSE Firms' Internal Auditors To Perform Critical Work ............................ 34
Recommendation 12 .............................................. 35

Finding 4: TM Did Not Review The Communication Strategy Component Of Bear Stearns' Contingency Funding Plan After The Collapse Of Two Of Its Managed Hedge Funds ......................... 35
Recommendation 13 .............................................. 36

Finding 5: TM's Monitoring Staff Do Not Adequately Track Material Issues ........................................................... 37
Develop a Formal Automated Tracking Process .................... 37
Recommendation 14 .............................................. 38

Follow-up on Prior OCIE Findings ............................... 38
Recommendation 15 .............................................. 40

Finding 6: The Commission's Orders Allowing Firms (Including Bear Stearns) To Use The Alternative Capital Method Were Generally Approved Before The Inspection Process Was Completed ........................................................... 40
Recommendation 16 .............................................. 41

Finding 7: Collaboration Between TM and Other Commission Divisions/Offices Should Be Significantly Improved ................ 41
Collaboration with CF .......................................... 41
Recommendation 17 .............................................. 42

Collaboration with OCIE ........................................ 42
Recommendation 18 .............................................. 43

Collaboration with ORA ......................................... 43
Recommendation 19 .............................................. 43

Finding 8: CF's Filing Review Of Bear Stearns' 2006 10-K Was Not Timely .......................................................... 44
Review of Bear Stearns' 10-K Filing ............................ 44

Recommendation 20 ........................................................ 45
Bear Stearns' Response to CF's Comment Letter .................. 45
Recommendation 21 ....................................................... 46

Finding 9:  Certain Firms May Pose A Systemic Risk
Because They Are Not Supervised On A Consolidated Basis ......... 46
Recommendation 22 ....................................................... 47

Finding 10:  TM Should Address Organizational Issues
Involving The Future Of The CSE Program ........................................ 48
Changes to the CSE Program ....................................... 48
Recommendation 23 ....................................................... 49

Program Staffing ......................................................... 49
Recommendation 24 ....................................................... 50

Ethics Manual ............................................................. 50
Recommendation 25 ....................................................... 50

Coordination with Other Regulators ............................................. 50
Recommendation 26 ....................................................... 51

Appendices
Appendix I:  Acronyms .................................................................. 52
Appendix II:  Congressional Audit Request ...................................... 54
Appendix III:  Curriculum Vitae (OIG expert: Albert "Pete" Kyle) ..................... 56
Appendix IV:  Scope and Methodology .......................................... 70
Appendix V:  List of Recommendations ............................................. 76
Appendix VI:  Chairman Cox's Comments ....................................... 81
Appendix VII:  Management Comments ........................................... 83
Appendix VIII:  OIG Response to Chairman Cox & Management
Comments ............................................................................. 115
Appendix IX:  Gross Leverage Ratios ............................................. 119
Appendix X:  Criteria .................................................................... 120

# Background and Objectives

## Background

**General Background Information.** The Division of Trading and Markets (TM)[14] is responsible for regulating broker-dealers, which includes administering the Consolidated Supervised Entity (CSE) and Broker-Dealer Risk Assessment programs. The Office of Compliance Inspections and Examinations (OCIE) has responsibility within the Securities and Exchange Commission (Commission) for conducting the inspections[15] of broker-dealers, including broker-dealers that are affiliated with CSE firms[16] (*i.e.,* investment banks).[17] The following TM offices are directly involved in these programs:

- Office of Financial Responsibility: This office is responsible for administering the financial responsibility regulations (*e.g.,* net capital rule[18]

---

[14] See Acronyms used in Appendix I.

[15] The Division of Trading and Markets (TM) uses the term "inspections", however, the Office of Compliance Inspections and Examinations (OCIE) uses the term "examinations". For purposes of this audit report, we use the term "inspections" to refer to both. In addition, for purposes of this audit report, OCIE also includes the Inspection staff in the Commission's regional offices.

[16] During our audit fieldwork, there were four Consolidated Supervised Entity (CSE) firms whose principal regulator (as discussed below) was the Commission: Goldman Sachs Group, Inc., Lehman Brothers Holdings Inc. (Lehman Brothers), Merrill Lynch & Co., Inc., and Morgan Stanley. On September 15, 2008, Lehman Brothers announced that it would file for bankruptcy protection and Bank of America announced that it agreed to acquire Merrill Lynch & Co., Inc. On September 21, 2008, the Federal Reserve approved, pending a statutory five-day antitrust waiting period, applications from Goldman Sachs and Morgan Stanley to become bank holding companies. The Bear Stearns Companies, Inc. (Bear Stearns) was also a CSE firm (approved in November 2005) until its collapse. In addition, JP Morgan Chase & Co. (JP Morgan) and Citigroup Inc. have been approved to use the alternative method for their broker-dealer capital requirements, but the Board of Governors of the Federal Reserve System (Federal Reserve) is their principal regulator (*i.e.,* is responsible for the consolidated entity) but the Commission is responsible for the oversight of their broker-dealers. As a result, the Securities and Exchange Commission (Commission) defers oversight (of the consolidated entity) of JP Morgan and Citigroup to the Federal Reserve to avoid duplicative or inconsistent regulation.

[17] In 2007, in response to a Government Accountability Office (GAO) report Financial Market Regulation: Agencies Engaged in Consolidated Supervision Can Strengthen Performance Measurement and Collaboration. Report 07-154, March 15, 2007 (as discussed in the Prior Audit Coverage section of the Scope and Methodology - see Appendix III); the Chairman (in consultation with the other Commissioners) transferred the responsibility for conducting inspections of the consolidated entity from OCIE to TM. OCIE retained (within the Commission) responsibility for conducting inspections on the CSE's broker-dealers. The Self Regulatory Organizations (SRO) have the primary inspection responsibility for the registered broker-dealers. OCIE has oversight responsibility of these broker-dealers and conducts periodic inspections. The Financial Industry Regulatory Authority (FINRA) is the primary regulator of approximately 5,000 broker-dealers registered in the United States (U.S.).

[18] "The net capital rule focuses on liquidity and is designed to protect securities customers, counterparties, and creditors by requiring that broker-dealers have sufficient liquid resources on hand at all times to satisfy claims promptly". Source: GAO Report Risk-Based Capital Regulatory and Industry Approaches to Capital and Risk, Report No. GGD-98-153, July 20, 1998.

and customer protection[19]).  These regulations are intended to protect customers and financial institutions.  This office also oversees the Securities Investor Protection Corporation and has approximately nine staff.[20]

- Office of Prudential Supervision and Risk Analysis:  The staff (referred to as "monitors") in this office work in teams of three to review each CSE firm.  They perform their work mainly through periodic meetings and informal discussions with CSE staff.  The staff also review CSE required financial filings.  The staff have backgrounds in economics, accounting, and finance and expertise in credit, market, or liquidity risk.  Approximately 13 individuals comprise the staff.

- Office of CSE Inspections:  This office is responsible for conducting the inspections on the CSE firms.  They have seven staff who are located in both Washington D.C. and New York.

**CSE Program.**  In 2004, the Commission adopted rule amendments under the Securities and Exchange Act of 1934,[21] which created the voluntary CSE program.  This program allows the Commission to supervise certain broker-dealer holding companies on a consolidated basis.  In this capacity, Commission supervision extends beyond the registered broker-dealer to the unregulated affiliates of the broker-dealer and the holding company itself.  The CSE program was designed to allow the Commission to monitor for financial or operational weakness in a CSE holding company or its unregulated affiliates that might place United States (U.S.) regulated broker-dealers and other regulated entities at risk.

A broker-dealer becomes a CSE by applying to the Commission for an exemption from the Commission's standard net capital rule,[22] and the broker-dealer's ultimate holding company consenting to group-wide Commission supervision, if it does not already have a principal regulator.  By obtaining an exemption from the standard net capital rule, the CSE firms' broker-dealers are permitted to compute net capital using an alternative method.[23]

---

[19] The customer protection rule "is designed to ensure that customer property (securities and funds) in the custody of broker-dealers is adequately safeguarded."
Source: GAO Report Risk-Based Capital Regulatory and Industry Approaches to Capital and Risk, Report No. GGD-98-153, July 20, 1998.

[20] The Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa *et. seq.,* as amended, was enacted to protect customers from losses resulting from a broker-dealers' failure, thereby promoting investor confidence in the securities markets. The Securities Investor Protection Corporation was created by the Act to pay investor claims. (See 15 U.S.C. § 78ccc).

[21] Source: Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities (69 Fed Reg. 34.428).  Commission.  21 June 2004. <http://www.sec.gov/rules/final/34-49830.htm>.

[22] See 17 C.F.R. § 24015c3-1.

[23] The alternative capital method is based on mathematical models and scenario testing, while broker-dealers operating under the standard net capital rule must meet certain ratios and maintain minimum net capital levels based on the type of securities activities they conduct. (See 17 C.F.R. 240.15c3-1(a)(7)).

The Commission designed the CSE program to be broadly consistent with the Board of Governors of the Federal Reserve System's (Federal Reserve) oversight of bank holding companies.  However, the CSE program "reflects the reliance of securities firms on mark-to-market accounting as a critical risk and governance control.  Second, the design of the CSE regime reflects the critical importance of maintaining adequate liquidity in all market environments for holding companies that do not have access to an external liquidity provider." [24]

The CSE application process includes TM reviewing a firm's application[25] (for an exemption from the net capital rule) and makes a recommendation to the Commission.  Approval of the firm's application is contingent on the firm agreeing to group-wide Commission supervision of the consolidated entity (including unregulated affiliates), if the firm does not already have a principal regulator.  In addition, CSE firms must agree to:

- "Maintain and document an internal risk management control system for the affiliate group;"[26]

- "Calculate a group-wide capital adequacy measure consistent with the international standards adopted by the Basel Committee on Banking Supervision [[27]] ('Basel Standards')."[28]  The CSEs are required to maintain an overall Basel capital ratio[29] of not less than the Federal Reserve's 10 percent "well-capitalized" standard for bank holding companies.  The CSE must notify the Commission (*e.g.,* file an Early Warning Notice) if the 10 percent capital ratio is or is likely to be violated,[30] or if tentative net capital of the broker-dealer falls below $5 billion;[31]

---

[24] Source: *Examining Regulation and Supervision of Industrial Loan Companies*  Before US Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (October 4, 2007) (statement of Erik Sirri, Director of TM, Commission).

[25] The application process includes inspections whose purpose is to verify the information the firms provides during the application process and to "assess the adequacy of the implementation of the firm's internal risk management policies and procedures."
Source: SEC [Commission] Holding Company Supervision Program Description.  Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[26] Source: SEC [Commission] Holding Company Supervision Program Description.  Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[27] "The Basel Committee on Banking Supervision (Basel Committee) seeks to improve the quality of banking supervision worldwide, in part by developing broad supervisory standards.  The Basel Committee consists of central bank and regulatory officials from 13 member countries: Belgium, Canada, France, Germany, Italy, Japan, Luxembourg, the Netherlands, Spain, Sweden, Switzerland, United Kingdom, and United States.  The Basel Committee's supervisory standards are also often adopted by nonmember countries."  Source: GAO. Bank Regulators Need to Improve Transparency and Overcome Impediments to Finalizing the Proposed Basel II Framework. Report No. 07-253, February 15, 2007.

[28] Source: SEC [Commission] Holding Company Supervision Program Description.  Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.  [footnote added]

[29] The Basel capital ratio is capital divided by risk weighted assets.

[30] We are aware of one instance where this occurred.  In our opinion, TM acted reasonably.

[31] Sources for the information include:
- *Risk Management and its Implications for Systemic Risk* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri, Director of TM, Commission); and

- Maintain "sufficient stand-alone liquidity and sufficient financial resources to meet its expected cash outflows in a stressed liquidity environment where access to unsecured funding is not available for a period of at least one year. Another premise of this liquidity planning is that any assets held in a regulated entity are unavailable for use outside of the entity to deal with weakness elsewhere in the holding company structure, based on the assumption that during the stress event, including a tightening of market liquidity, regulators in the U.S. and relevant foreign jurisdictions would not permit a withdrawal of capital;"[32]

- "Consent to Commission examination [inspection] of the books and records of the ultimate holding company [*i.e.,* the consolidated entity] and its affiliates, where those affiliates do not have principal regulators;"[33]

- "Regularly report on the financial and operational condition of the holding company, and make available to the Commission information about the ultimate holding company or any of its material affiliates that is necessary to evaluate financial and operations risks within the ultimate holding company and its material affiliates;"[34] and

- "Make available [examination] inspection reports of principal regulators for those affiliates that are not subject to Commission [examination] inspection."[35]

The firms agreed to consolidated supervision because of the preferential capital treatment under the alternative method and international requirements. The European Union's (EU) Conglomerates Directive required that affiliates of U.S. registered broker-dealers demonstrate that they were subject to consolidated supervision by a U.S. regulator or face significant restrictions on their European operations.[36]

---

- Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities (69 Fed Reg. 34-428). Commission. 21 June 2004. <http://www.sec.gov/rules/final/34-49830.htm>.

[32] Source: *Risk Management and its Implications for Systemic Risk* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri, Director of TM, Commission).

[33] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[34] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[35] Source: SEC [Commission] Holding Company Supervision Program Description. Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[36] According to the CSE final rule, "EU [European Union] 'consolidated supervision' consists of a series of quantitative and qualitative rules, imposed at the level of the ultimate holding company, regarding firms' internal controls, capital adequacy, intra-group transactions, and risk concentration. Without a demonstration of 'equivalent' supervision, U.S. securities firms have expressed concerns that an affiliate institution located in the EU either may be subject to additional capital charges or be required to form a sub-holding company in the EU.' See 'Directive 2002/87/EC of the European Parliament and of the Council of 16 December 2002." Source: Final Rule: Alternative Net Capital Requirements for Broker-Dealers That Are Part of Consolidated Supervised Entities (69 Fed Reg. 34.428). Commission. 21 June 2004. <http://www.sec.gov/rules/final/34-49830.htmP42_10820>.

**Mortgage Loans.** Beginning around late 2004, lenders offered mortgages to individuals who did not meet the normal qualifications (*e.g.,* income or credit history). Many of these loans had teaser rates and/or were interest only. These more risky loans are referred to as "subprime mortgages." The theory behind approving these risky loans was that the homeowner would be able to refinance the loan in a few years because of the increased growth in home values and the individual's improved credit rating. Banks converted these loans into securities and sold the securities to other firms (known as the securitization process).

Once home values began to decrease, mortgage loan defaults started to increase, causing the market value of the mortgage securities to decrease. In the ensuing months, the financial services industry wrote-down billions of dollars in the value of all types of mortgage securities.[37]

**Bear Stearns' Collapse.**[38] The Bear Stearns Companies, Inc. (Bear Stearns) was a holding company that had two registered broker-dealers. Its main activities were investment banking, securities and derivatives sales and trading, clearance, brokerage and asset management.[39] Bear Stearns was highly leveraged[40] with a large exposure (*i.e.,* concentration of assets) in mortgage-backed securities.[41] Bear Stearns also had less capital and was less diversified than several of the CSE firms.

In June 2007, two of Bear Stearns' managed hedge funds collapsed because of subprime mortgage losses.[42] Nearly a year later, during the week of March 10, 2008, rumors spread about liquidity problems at Bear Stearns. Due to Bear Stearns' lenders not rolling over secured financing, Bear Stearns faced severe liquidity problems on March 14, 2008.[43] As a result, on March 14, 2008, JP Morgan Chase & Co. (JP Morgan) provided Bear Stearns with emergency

---

[37] In accordance with Generally Accepted Accounting Principles, the securities must be valued at fair market value (*i.e.,* mark to market accounting).

[38] Sources for this information include:
- *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Congress (April 3, 2008) (statement of Timothy Geithner, President and Chief Executive Officer, Federal Reserve Bank of New York (FRBNY);
- *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Congress (April 3, 2008) (statement of Jamie Dimon (Chairman and Chief Executive Officer, JP Morgan); and
- *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Congress (April 3, 2008) (statement of Alan Schwartz (President and Chief Executive Officer, Bear Stearns).

[39] Source: 2006 Bear Stearns' Annual Report (page 32).

[40] There are many definitions of leverage. A simple definition of leverage is assets divided by capital. Bear Stearns' gross leverage ratio was about 33-1. See Appendix IX.

[41] Depending on the definition used to classify a mortgage as "subprime", Bear Stearns' exposure to subprime mortgages varied. However, it clearly had a large exposure to mortgage securities overall.

[42] Bear Stearns' direct exposure to these hedge funds was minimal.

[43] A pledge of collateral supports secured financing.

funding.[44]  According to Congressional testimony,[45] after the markets closed on March 14, 2008, it became apparent that FRBNY's funding could not stop Bear Stearns' downward spiral.  As a result, Bear Stearns concluded that it would need to file for bankruptcy protection on March 17, 2008, unless another firm purchased it.[46]  On March 16, 2008, Bear Stearns' sale to JP Morgan was announced with financing support from the FRBNY.  In May 2008, the sale was completed.

In testimony given before the Senate Committee on Banking, Housing, and Urban Affairs on April 3, 2008, Chairman Christopher Cox stated that Bear Stearns' collapse was due to a liquidity crisis caused by a lack of confidence.[47] Chairman Cox described Bear Stearns' collapse as a "run on the bank"[48] which occurred exceptionally fast and in an already distressed market environment (*i.e.,* the credit crisis).  Specifically, Chairman Cox testified as follows:

> What happened to Bear Stearns during the week of March 10th was likewise unprecedented.  For the first time, a major investment bank that was well-capitalized and apparently fully liquid experienced a crisis of confidence that denied it not only unsecured financing, but short-term secured financing, even when the collateral consisted of agency securities with a market value in excess of the funds to be borrowed.  Counterparties would not provide securities lending services and clearing services. Prime brokerage clients moved their cash balances elsewhere.  These decisions by counterparties, clients, and lenders to no longer transact with Bear Stearns in turn influenced other counterparties, clients, and lenders to also reduce their exposure to Bear Stearns.[49]

---

[44] The funding was from FRBNY through JP Morgan to Bear Stearns because JP Morgan could borrow money from FRBNY.

[45] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Congress (April 3, 2008) (statements of Timothy Geithner, President and Chief Executive Officer, FRBNY) and Alan Schwartz, President and Chief Executive Officer, Bear Stearns).

[46] Source: *Turmoil in the U.S. Credit Markets: Examining the Regulation of Investment Banks by the Securities and Exchange Commission* Before the U.S. Senate on Securities, Insurance, and Investment 110th Cong. (May 7, 2008) (statement of Erik Sirri, Director of TM, Commission).

[47] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before US Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

[48] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before US.. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

[49] Source: *Turmoil in U.S. Credit Markets: Examining the Recent Actions of Federal Financial Regulators* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

According to a Commission press release,[50] TM monitored Bear Stearns' capital and liquidity daily since Bear Stearns' hedge funds collapsed.  According to data (provided to TM by Bear Stearns), there was adequate capital at the holding company level and at Bear Stearns' two registered broker-dealers prior to and during the week of March 10, 2008.  In addition, the Commission stated that Bear Stearns was compliant with the $5 billion liquidity requirement.[51]  Furthermore, according to data we reviewed, Bear Stearns had significantly increased its liquidity levels since May 2007.[52]

The Commission stated that neither the CSE program nor any regulatory model (*i.e.,* the Basel Standards)[53] used by commercial or investment banks considered the possibility that secured financing, even when backed by high-quality collateral could become completely unavailable.  Instead, the CSE program only considered that a deterioration of secured financing could occur (*e.g.,* that financing terms could become less favorable) and that unsecured funding could be unavailable for at least one year.

**The Commission's Response to Bear Stearns' Collapse.**  In the aftermath of Bear Stearns' collapse, the Commission has:

- Supported the work of the Basel Committee on Banking Supervision regarding their planned updated guidance (*i.e.,* strengthening the standards applicable to liquidity risks) on liquidity management;[54]
- Supported legislation to make the CSE program mandatory.[55]  At a recent Congressional hearing before the Committee on Financial Services, House of Representatives, July 24, 2008, Chairman Christopher Cox stated:

---

[50] Source: <u>Statement of SEC Division of Trading and Markets Regarding The Bear Stearns Companies.</u> Commission. 14 March 2008. <http://www.sec.gov/news/press/2008/2008-44.htm>.  The Chairman also made similar statements in his letter to the Basel Committee regarding liquidity management; and testimony (*Turmoil in U.S. Credit Market: Examining the Recent Actions of Federal Financial Regulators* Before US Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission)).

[51] As discussed in the Scope and Methodology section (see Appendix IV), we did not independently verify (*i.e.,* recalculate and determine the accuracy) Bear Stearns' capital or liquidity amounts.

[52] According to the Commission, Bear Stearns had a high of $21 billion (in liquidity) in early March 2008, (*i.e.,* before the week of March 10), compared to $7.6 billion in May 2007 according to TM data. Source: <u>Chairman Cox Letter to Basel Committee in Support of New Guidance on Liquidity</u> Management. Commission. 14 March 2008.  <http://www.sec.gov/news/press/2008/2008-48.htm>.

[53] The CSE firms operate under the Basel II standards.

[54] Source: <u>Chairman Cox Letter to Basel Committee in Support of New Guidance on Liquidity</u> Management. Commission. 14 March 2008.  <http://www.sec.gov/news/press/2008/2008-48.htm>.

[55] Sources of this information include:
- *Risk Management and its Implications for Systemic Risk* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri, Director of TM, Commission); and
- *Systemic Risk and the Financial Markets* Before U.S. House of Representatives Committee on Financial Services, 110th Cong. (July 24, 2008) (statement of Christopher Cox, Chairman, Commission).

The mandatory consolidated supervision regime for investment banks should provide the SEC [Commission] with several specific authorities. Broadly, with respect to the holding company, these include authority to: set capital and liquidity standards; set recordkeeping and reporting standards; set risk management and internal control standards; apply progressively more significant restrictions on operations if capital or liquidity adequacy falls, including requiring divestiture of lines of business; conduct examinations and generally enforce the rules; and share information with other regulators. Any future legislation should also establish a process for handling extraordinary problems, whether institution-specific or connected with broader market events, to provide needed predictability and certainty.[56]

- Requested dedicated Congressional funding for the CSE program and increased CSE staffing from about 25 to 40 people;[57]

- Consulted with the CSE firms on their liquidity situation (*e.g.,* funding plans). Specifically, the Commission worked with the firms to:

    o   increase their liquidity levels;[58]

    o   lengthen the terms of their secured and unsecured financing;[59]

    o   review their risk practices and models;[60]

    o   discuss their long-term funding plans, including plans for raising new capital by accessing the equity and long-term debt markets;[61]

    o   increase their public disclosures of their capital and liquidity;[62]

---

[56] Source: *Systemic Risk and the Financial Markets* Before U.S. House of Representatives Committee on Financial Services, 110th Cong. (July 24, 2008) (statement of Christopher Cox, Chairman, Commission).

[57] Source: *Risk Management and its Implications for Systemic Risk* Before U.S. Senate Committee on Banking, Housing and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri, Director of TM, Chairman, Commission).

[58] Source: *Turmoil in U.S. Credit Market: Examining the Recent Actions of Federal Financial* Regulators, Before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

[59] Source: *Turmoil in the U.S. Credit Markets: Examining the Regulation of Investment Banks by the Securities and Exchange Commission* Before the U.S. Senate on Securities, Insurance, and Investment 110th Cong. (May 7, 2008) (statement of Erik Sirri, Director of TM, Commission).

[60] Source: *Turmoil in the U.S. Credit Markets: Examining the Regulation of Investment Banks by the Securities and Exchange Commission* Before the U.S. Senate on Securities, Insurance, and Investment 110th Cong. (May 7, 2008) (statement of Erik Sirri, Director of TM, Commission).

[61] Source: *Systemic Risk and the Financial Markets* Before U.S. House of Representatives Committee on Financial Services, 110th Cong. (July 24, 2008) (statement of Christopher Cox, Chairman, Commission).

- Invited FRBNY examiners to review the CSE firms' funding and how the firms are managing their funding;[63] and

- In July 2008, the Commission and the Federal Reserve agreed on a Memorandum of Understanding (MOU) involving coordination and information sharing.[64]

# Objectives

As a result of the collapse of Bear Stearns in March 2008, we received a Congressional request to perform this audit of the Commission's CSE Program, in addition to an audit of the Commission's Broker-Dealer Risk Assessment Program (see Appendix II).

The objectives of this audit were to evaluate the Commission's CSE program, emphasizing the Commission's oversight of Bear Stearns and to determine whether improvements are needed in the Commission's monitoring of CSE firms and its administration of the CSE program.

The objectives of the audit on the Commission's Broker-Dealer Risk Assessment Program were to follow up on recommendations made in the Office of Inspector General's (OIG) prior audit report of the Risk Assessment Program (*Broker-Dealer Risk Assessment Program*, Report No. 354, issued on August 13, 2002) and to examine the Broker-Dealer Risk Assessment process to determine whether improvements are needed.  Audit report number 446-B discusses the Risk Assessment Program in detail and addresses these objectives.

---

[62] Source: Speech by SEC [Commission] Chairman: Address to the Security Traders 12th Annual Washington Conference. Commission. 7 May 2008.
<http://www.sec.gov/news/speech/2008/spch050708cc.htm>.

[63] Source: *Turmoil in U.S. Credit Market: Examining the Recent Actions of Federal Financial Regulators* Before US Senate Committee on Banking, Housing, and Urban Affairs, 110th Cong. (April 3, 2008) (statement of Christopher Cox, Chairman, Commission).

[64] SEC [Commission], FRB Sign Agreement to Enhance Collaboration, Coordination and Information Sharing. Commission. 7 July 2008. <http://www.sec.gov/news/press/2008/2008-134.htm>.

---