and demands for redemptions.  Some of these hedge funds became financially distressed.  This led to discussions between TM and Bear Stearns concerning what deductions from capital were appropriate for a financially stressed hedge fund repo counterparty.[150]  Consistency with the spirit of Basel II requires that the capital for a stressed repo counterparty (with no assets other than the collateral it has posted) be at least as great as the capital requirement Bear Stearns would face if it purchased the collateral for the amount owed on the repo transaction.  The OIG expert believes that internal TM memoranda suggest that Bear Stearns may have been taking a smaller capital charge than Basel II requires.  In addition, internal TM memoranda do not indicate that TM pressured Bear Stearns to take more aggressive capital charges on stressed repos.

Lastly, BSAM's "High Grade" hedge fund became a very large, stressed repo counterparty to Bear Stearns during the summer of 2007.[151]  As of June 2007, Bear Stearns loaned $1.6 billion to BSAM's "high grade" fund.  The loan was collateralized with assets estimated to be worth $1.7 to $2 billion.  By the end of June 2007, asset sales had reduced the amount loaned to the fund down to $1.345 billion, but the value of the remaining collateral had deteriorated to a level very close to the value of the loan.[152]  The BSAM "High Grade" hedge fund evidently had no assets other than the collateral Bear Stearns already held.  Although the BSAM investors may have benefited to some extent from increases in the value of the collateral, Bear Stearns bore all risks associated with the downside.  Since Bear Stearns bore all downside risks, sound risk management (consistent with Basel II) requires that the impact on Bear Stearns' capital associated with these repos should have been at least as great as the impact Bear Stearns would incur if it held the assets in its own trading book at the end of June 2007.

According to the OIG expert, a stressed repo is conceptually similar to a portfolio with a call option written against it, where the portfolio is the repo collateral and the call option is the upside gains to the stressed counterparty.  Such a stressed repo is worth less than the portfolio itself, since the call option might have some value.  In addition, the value of this stressed repo should have reflected the possibility that Bear Stearns might not benefit fully from potential upside gains in the value of the collateral.  Furthermore, to the extent that the $1.345 billion in collateral was illiquid and would take time to liquidate, Bear Stearns should have valued the collateral conservatively, reflecting appropriate valuation adjustments.

TM memoranda summarizing discussions with Bear Stearns' risk managers suggest that the capital charge incurred by Bear Stearns at the end of June 2007 was far less than the capital charge consistent with sound risk management.  TM memoranda indicate that by the end of July 2007, "Bear Stearns effectively took

---

[150] Source: TM's internal credit meeting memorandum with Bear Stearns dated June 2007.
[151] Source: TM's internal credit meeting memoranda with Bear Stearns dated May 2007, June 2007, and July 2007.
[152] Source: TM's internal credit meeting memorandum with Bear Stearns dated June 2007.

the collateral onto its own balance sheet while putting in place agreements that allow fund investors to enjoy some of the upside should (contrary to expectations) the value of the collateral rise."[153]  This arrangement is similar to a portfolio with a call option written against it.

The OIG expert did not find any evidence suggesting that TM exerted influence on Bear Stearns to take significantly larger capital charges in conjunction with the BSAM financing than would have been appropriate if the repo were not stressed.  For instance, according to TM internal documentation on July 5, 2007:

> [The] Enhanced [fund] is in the process of liquidating its remaining positions in an orderly manner while Bear Stearns has stepped in to assume the secured funding obligations of other creditors to the High Grade fund. Currently, none of the CSE firms have more than de minimis exposure, net of collateral, to either fund. However, they are reviewing their policies regarding setting "haircuts" on less liquid positions that are financed on a secured basis.[154]

TM staff could have used much tougher language to describe (to senior TM management) the very risky situation in which Bear Stearns had put itself and exerted influence over Bear Stearns accordingly.  For example, TM staff could have stated that Bear Stearns' financing of the High Grade fund appeared to have allowed Bear Stearns to delay taking a huge hit to its capital, as required by Basel II.

Bear Stearns' financing of the BSAM funds is conceptually similar to implicit support.  According to Basel II, "Implicit support arises when a bank provides support to a securitization in excess of its predetermined contractual obligation."[155]  Although the BSAM funds are not themselves, literal securitizations, the funds invested in securitizations, and Bear Stearns' financing of the BSAM funds is a form of support in excess of Bear Stearns' contractual obligations to the funds.  The repo structure created the potential for Bear Stearns to overstate the amount of risk borne by BSAM and understate its own exposure; as a result, Bear Stearns' capital calculation would understate its true risk.[156]  Basel II also requires that "When a bank has been found to provide implicit support to a securitization, it will be required to hold capital against all of the underlying exposures associated with the structure as if they had not been securitized."[157]  In the opinion of the OIG expert, it would have been appropriate

---

[153] Source: TM's internal monthly staff memorandum to TM Division Director dated August 3, 2007.
[154] Source: TM's internal monthly staff memorandum to TM Division Director dated July 5, 2007.
[155] Source: Basel Committee on Banking Supervision: International Convergence on Capital Measurement and Capital Standards, June 2006, paragraph 551. < http://www.bis.org/publ/bcbs128.pdf>.
[156] Source: Basel Committee on Banking Supervision: International Convergence on Capital Measurement and Capital Standards, June 2006, paragraph 791. < http://www.bis.org/publ/bcbs128.pdf>.
[157] Source: Basel Committee on Banking Supervision: International Convergence on Capital Measurement and Capital Standards, June 2006, paragraph 792. <http://www.bis.org/publ/bcbs128.pdf>.

for TM to have treated the BSAM financing in a manner parallel to the way in which Basel II mandates that implicit support be treated.

In fact, Bear Stearns eventually acquired much of the remaining portfolio and wrote its value down by $500 million in the fall of 2007.[158]

**Recommendation 10:**
The Division of Trading and Markets should ensure that the Consolidated Supervised Entity take appropriate valuation deductions for illiquid, hard-to-value assets and appropriate capital deductions for stressed repos, especially stressed repos where illiquid securities are posted as collateral.

## Tolerance for Risk

TM's oversight of the CSE firms did not include assessing the risk tolerance (*e.g.,* concentration of assets) of the CSEs' Boards of Directors and other senior management (*e.g.,* CEO). In fact, TM staff never contacted these individuals about any matters relating to risk tolerance at any of the CSE firms, including Bear Stearns prior to its collapse.

We conclude based on our research that discussing risk management practices and risk tolerance with the CSEs' Boards of Directors is a prudent oversight procedure.[159] This type of assessment would assist TM staff to evaluate governance issues in the CSE firms. For example, in the case of Bear Stearns, an assessment could have been useful when there was evidence that the staff kept increasing the firm's exposure to mortgage securities. TM staff could also assess whether firms are inappropriately increasing leverage to help meet a revenue level that is tied to compensation that is provided to the CSEs' senior officers.[160]

**Recommendation 11:**
The Division of Trading and Markets (TM), in consultation with the Chairman's Office, should discuss risk tolerance with the Board of Directors and senior management of each Consolidated Supervised Entity (CSE) firm to better understand whether the actions of CSE firm staff are consistent with the desires of the Board of Directors and senior management. This information would

---

[158] Source: TM's internal credit meeting memorandum with Bear Stearns dated October 2007.
[159] Sources for this information include:
- *Risk Management and its Implications for Systemic Risk* Before the U.S. Senate Subcommittee on Securities, Insurance, and Investment Committee on Banking, Housing, and Urban Affairs, 110th Cong. (June 19, 2008) (statement of Erik Sirri Director of TM, Commission);
- The Comptroller of the Currency. Liquidity and Funds Management Manual, February 2001, page 27; and
- The Counterparty Risk Management Policy Group. Containing Systemic Risk: The Road to Reform. August 6, 2008, page 18.
[160] TM stated that the Chairman and the TM Director have recently begun having discussions with these senior CSE personnel about undertaking this type of assessment.

enable TM to better assess the effectiveness of the firms' risk management systems.

## Finding 3: TM, Without Explicit Authority, Allowed The CSE Firms' Internal Auditors To Perform Critical Work

> TM, without explicit authority, allowed the firms' internal auditors to perform critical work involving the risk management control systems. As a result, there are significant questions as to whether the work that TM relied upon in fulfilling its oversight role was as thorough or meaningful as the Commission intended in approving the rule amendments.

The CSE firms are required by the rule amendments which created the CSE program (see 17 CFR §240.15c3-1g(b)(1)(iii)(B)) to have their external auditors report[161] on the firms' risk management control systems. This review is critical because TM designed the CSE program to focus on a firm's risk management systems (e.g., internal controls, models) and their financial condition (e.g., compliance with capital and liquidity requirements), which was to be the focus of the external auditors' work. However, after the Commission approved the rule, TM decided that the firms' internal auditors could perform this critical work, instead of the external auditors.

We reviewed the delegations of authority from the Commission to TM and found no explicit authority for TM to approve this change. In addition to the apparent lack of TM's legal authority, there are serious questions about the wisdom of this decision. The rule's requirement that external auditors perform the risk management work helps to ensure the independence and quality of this critical audit work. The external auditors' work is more strictly regulated as the Public Company Accounting Oversight Board (PCAOB) regulates external auditors.[162]

---

[161] The report is referred to in the rule as the "Accountant's Report on Internal Risk Management Control System."

[162] The Sarbanes-Oxley Act of 2002 (SOX), Public Law No. 107-204, was enacted in July 2002 in response to numerous financial statement accounting scandals involving public companies (e.g., Enron and WorldCom) and their auditors (e.g., Arthur Andersen). Among other reforms, SOX established the Public Company Accounting Oversight Board (PCAOB) as a nonprofit corporation. The PCAOB's statutory mission is "to oversee the audits of public companies that are subject to the securities laws, and related matters, in order to protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports for companies the securities of which are sold to, and held by and for, public investors." (Section 101(a) of SOX, 15 U.S.C §7211(a)). SOX requires that accounting firms be registered with the PCAOB, if they "prepare or issue, or participate in the preparation or issuance of, any audit report with respect to any issuer" as defined in Section 3 of the Securities Exchange Act of 1934.

TM's own internal memorandum dated November 2006 noted significant deficiencies in Bear Stearns internal auditors' work, as follows:

> The audits for Market Risk Management, Credit Risk Management, and Funding/Liquidity Risk Management are completed and the reports are in draft form.  At this point it can be noted the [sic] there appears to be significant deficiencies in the coverage for the review of liquidity and funding risk management which will be a focal point of our discussions of scope expansion in the 2007 CSE audits.[163] [Emphasis added]

As a result of TM's decision to allow CSE firm's internal auditors to perform the work, there are significant questions as to whether this work that TM relied upon was as thorough or meaningful as the Commission intended in approving the rule.

**Recommendation 12:**
The Division of Trading and Markets should require compliance with the existing rule that requires external auditors to review the Consolidated Supervised Entity firms' risk management control systems or seek Commission approval in accordance with the Administrative Procedures Act[164] for this deviation from the current rule's requirement.

# Finding 4:  TM Did Not Review The Communications Strategy Component Of Bear Stearns' Contingency Funding Plan After The Collapse Of Two Of Its Managed Hedge Funds

> TM did not review the communications strategy component of Bear Stearns' Contingency Funding Plan (CFP) after two of its managed hedge funds collapsed in June 2007.  Questions regarding Bear Stearns' effectiveness in communicating with its investors and the public were raised after the collapse of its hedge funds and again after the firm collapsed in March 2008.

---

[163] Given the scope of our audit, we have no evidence linking these "significant deficiencies" with the cause of Bear Stearns' collapse.

[164] The Administrative Procedures Act (5 U.S.C. §500 *et. seq.,*) sets forth the basic procedural requirements for agency rulemaking.  It generally requires (1) publication of a notice of proposed rulemaking in the *Federal Register*, (2) opportunity for public participation in rulemaking by submission of written comments, and (3) publication of a final rule and accompanying statement of basis and purpose not less than 30 days before the rule's effective date.

TM reviewed Bear Stearns' CFP during its application process.  The review included an assessment of its internal and external communications strategies.  According to TM:

> The goal of the contingency funding plan is to manage liquidity risk and communicate effectively with creditors, investors, and customers during a funding crisis.[165]

In June 2007, two of Bear Stearns' managed hedge funds collapsed.  After the collapse, questions were raised about the lack of involvement by some of Bear Stearns senior management in handling the crisis.  For instance, according to media reports, at an August conference call with investors, the conduct of a senior Bear Stearns official (*i.e.,* their lack of involvement in the telephone call) did not apparently help to restore confidence in the firm (which was the purpose of the meeting).

TM did not reassess the communication strategy component of Bear Stearns' CFP after the collapse of its hedge funds.  Although there was contact between TM and Bear Stearns (about many issues) after the June 2007 collapse of its hedge funds, at no point did TM discuss Bear Stearns' communication strategy.  This proved particularly problematic as questions were once again raised about some of Bear Stearns' management[166] regarding its handling of the crisis during the week of March 10, 2008.

Conversely, some individuals praised Lehman Brothers Holdings Inc. (Lehman Brothers) management for its handling of a crisis it previously experienced (*e.g.,* Lehman Brothers provided talking points to its traders to use with its trading partners).  In fact, some of these individuals credited Lehman Brothers' management with helping to save the firm during/around the week of March 10, 2008, when Bear Stearns collapsed.[167]

It is undisputed that a firm's communication strategy can affect confidence levels in the firm.  Bear Stearns' collapse illustrated the importance of confidence for an investment bank's survival.

**Recommendation 13:**
The Division of Trading and Markets should ensure that reviews of a firm's Contingency Funding Plan include an assessment of a Consolidated Supervised Entity firm's internal and external communication strategies.

---

[165] Source: TM's internal Liquidity and Funding Risk Review manual (draft) dated March 3, 2004.
[166] We did not asses the performance of Bear Stearns' management during the collapse of the hedge funds or Bear Stearns.
[167] While Bear Stearns collapsed in March 2008, concerns about Lehman Brothers' survival began to circulate and on September 15, 2008, Lehman Brothers announced that it would file for bankruptcy.

# Finding 5:  TM's Monitoring Staff Do Not Adequately Track Material Issues

TM's monitoring staff identify numerous issues involving internal risk management systems (*e.g.,* the adequacy of CSE staffing levels in various departments, the functioning of the internal audit office, and the adequacy of documented policies and procedures) which require action by the CSEs and a resolution.  However, TM does not adequately track the issues.

## Develop a Formal Automated Tracking Process

TM's monitoring staff does not have a formal process (*e.g.,* automated) to track material issues to ensure that they are adequately resolved.  The monitoring staff mainly identify issues through meetings with CSE firm staff.  Currently, TM staff document some issues (*e.g.,* the adequacy of the CSE staff levels in various departments, the functioning of the internal audit office and the adequacy of documented policies and procedures) in e-mails and organizes them by firm while other issues are documented in monthly memoranda to senior management (*e.g.,* the Division Director).[168]

However, these current methods are not reliable and do not provide an audit trail.  Our review of TM's documentation supports this assertion because we assessed twenty issues[169] that TM and OCIE identified with the CSE firms and we asked TM to explain how the issues were resolved.  In some instances, the staff needed to perform detailed research in order to determine how the issues were eventually resolved.  For example, OCIE staff found that Bear Stearns' Legal & Compliance group did not have any formal documentation that identified and assessed all of the applicable rules, laws, regulations, requirements and risks pertaining to the entire organization.  TM could not readily tell us how and whether this issue was resolved.  The follow-up of issues that OCIE identified is further discussed on page 38.

In a somewhat similar recent situation, the Government Accountability Office (GAO) criticized OCIE for its informal method of tracking recommendations regarding its Self Regulatory Organization (SRO) inspections.  GAO stated:

> OCIE's informal methods for tracking inspection recommendations contrast with the expectations set by federal internal control standards for ensuring that management has relevant, reliable, and

---

[168] These monthly memoranda describe current significant issues that for instance, the staff identified during their meetings with CSE staff.  However, the memoranda do not generally discuss the resolution of prior issues, as this is not the purpose of the memoranda.  The memoranda are stored on a shared computer network.

[169] As discussed in the Scope and Methodology Section (see Appendix III).

timely information regarding key agency activities. These standards state that key information on agency operations should be recorded and communicated to management and others within the entity and within a time frame that enables management to carry out its internal control and other responsibilities. [170]

Given all the facts discussed above, TM cannot provide reasonable assurance (consistent with internal control standards) that issues are adequately resolved. Furthermore, we believe that the risk of an issue being overlooked (*i.e.,* not adequately resolved by a firm) increases if, the CSE program receives additional staff (as requested by Chairman Cox) because presumably more issues will be identified and require resolution.

**Recommendation 14:**
The Division of Trading and Markets should develop a formal automated process to track material issues identified by the monitoring staff to ensure that they are adequately resolved. At a minimum, the tracking system should provide the following information:

- The source of the issue;

- When the issue was identified;

- Who identified the issue;

- The current status of the issue (*e.g.,* new developments);

- When the issue was resolved; and

- How the issue was resolved.

## Follow-Up on Prior OCIE Findings

Prior to July 2007, OCIE was responsible for conducting inspections of the CSE firms at the holding company level, while TM was responsible for monitoring the CSE firms at the holding company level. In July 2007, Chairman Cox transferred the inspections authority from OCIE to TM, thus consolidating the oversight of the CSEs at the holding company level within TM.[171] OCIE continues to perform inspections of the CSEs' broker-dealers.

---

[170] Source: GAO. <u>Securities and Exchange Commission: Opportunities Exist to Improve Oversight of Self-Regulatory Organizations</u>, Report 08-33, November 15, 2007.
[171] The transfer was in response to a GAO audit report (<u>Financial Market Regulation: Agencies Engaged in Consolidated Supervision Can Strengthen Performance Measurement and Collaboration</u>. Report 07-

While OCIE was responsible for conducting inspections at the holding company level, it identified numerous issues during its inspections performed as part of the CSE firms' application processes. TM stated that after Chairman Cox transferred the inspection authority from OCIE to TM, it decided not to follow-up on issues that OCIE identified because they did not view the OCIE issues as material and they assumed that these issues were OCIE's responsibility. OCIE stated that they did not follow-up (i.e., conduct a new inspection) on the issues because it was no longer their responsibility once Chairman Cox transferred the inspections authority to TM.[172] Although TM stated that it had communicated with Bear Stearns about resolving this issue, TM did not make any efforts to verify Bear Stearns' assertions that it had addressed this issue. Further, OCIE provided TM with a list of eight issues related to Bear Stearns, that OCIE believed were particularly significant.[173] Two of these issues are discussed below.

As discussed in the Scope and Methodology section in Appendix IV, we performed testing on TM's tracking of material issues. Our testing found instances where TM's monitoring staff failed to ensure that issues identified by OCIE were adequately resolved.

We found that OCIE had identified significant issues that could have affected Bear Stearns' approval to become a CSE. One issue involved concerns that Bear Stearns was not sufficiently retaining its internal audit workpapers. Although TM stated that they had spoken to Bear Stearns about resolving this issue, no follow-up work was conducted. This issue raised by OCIE was clearly significant in nature as in fact, according to an internal memorandum, TM and OCIE both agreed that they must reach an agreement with Bear Stearns on this issue prior to its approval as a CSE. In addition, OCIE identified a second significant issue during the application inspection, regarding the adequacy of

---

154, March 15, 2007) recommendation. In response to the report Chairman Cox told GAO: "To implement this recommendation, I have carefully considered the question of which organizational structure will best achieve the goal of the CSE program. I have concluded that the success of the CSE program will be best ensured if the supervision of the CSE firms is fully integrated with, rather than merely coordinated with, the detailed onsite testing that is done of the documented controls at CSE firms. As a result, I have decided to transfer responsibility for on-site testing of the CSE holding company controls to the Division of Market Regulation [now called TM]. This will better align the testing and supervision components of the CSE program, will strengthen its prudential character, and will most efficiently utilize the Commission's resources. With the new structure, ongoing supervision activities will be more directly informed by the results of focused testing of controls, and field inspections will be more precisely targeted using information from ongoing supervisory work. In addition, the Commission's expertise related to the prudential supervision of securities firms will be concentrated in the Division of Market Regulation, which will foster improved communication and coordination among the staff responsible for administering various components of the CSE program." The Chairman made his decision after carefully evaluating proposals from TM and OCIE, and after consulting with the four other Commissioners, who unanimously supported the decision to consolidate CSE oversight under TM.

[172] After the Orders allowing the firms to use the alternative capital method were issued (from December 2004 to November 2005), OCIE retained the inspection authority up until July 2007.

[173] These issues were identified in a memorandum from OCIE to TM dated November 4, 2005.

Bear Stearns' VaR models, as discussed on page 20.  The OIG expert found similar problems with Bear Stearns' VaR models, which raised serious questions about TM's oversight of Bear Stearns.

As a result, it is possible that other issues identified by OCIE were significant and were not adequately followed up on by TM.

**Recommendation 15:**
The Division of Trading and Markets should: (1) reassess all the prior Office of Compliance Inspections and Examinations (OCIE) issues to ensure that no significant issues are unresolved (given the belief that OCIE followed up); and (2) follow up on all significant issues.

# Finding 6:  The Commission's Orders Allowing Firms (Including Bear Stearns) To Use The Alternative Capital Method Were Generally Approved Before The Inspection Process Was Completed

> The Commission approved firms to use the alternative capital method before OCIE completed its inspection process.

OCIE's and TM's inspections of firms are a significant part of the application process, and are supposed to be completed prior to a firm's approval as a CSE.[174]  The purpose of an inspection is to verify the information provided by the firm and to "assess the adequacy of the implementation of the firm's internal risk management policies and procedures."[175]  However, four of five Commission Orders approving the firms (those without principal regulators) to use the alternative capital method were issued by the Commission before the inspection process was completed, thereby rendering the application process less meaningful.[176]  TM acknowledged that they were aware that OCIE did not complete the inspection process prior to the Commission's approval.  Yet, TM recommended to the Commission that the firms be approved to use the alternative capital method without first completely verifying the information it was

---

[174] As a result of the organizational change at the Commission, OCIE would no longer be involved in the application inspection.

[175] Source: SEC [Commission] Holding Company Supervision Program Description.  Commission. 5 June 2008. <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

[176] Other than the inspection performed during Bear Stearns' application process, neither TM nor OCIE performed any additional inspections of Bear Stearns involving firm-wide issues (e.g., risk management) prior to its collapse.  However, this does not include any inspections (e.g., financial and operational) that FINRA performed of Bear Stearns' broker-dealers.

supposed to be relying upon and without ensuring that the firms had adequately implemented internal risk management policies and procedures.

Specifically, we found that:

- In two instances, the Commission approved the Order before OCIE sent the firms a formal letter (*i.e.,* the deficiency letter) describing the issues that were identified during the inspection. Bear Stearns was one of these two firms. In fact, as previously discussed in Finding 5, during Bear Stearns' inspection, OCIE identified a significant issue involving Bear Stearns not retaining internal audit workpapers. In fact, according to an internal memorandum, TM and OCIE both agreed that they must reach an agreement with Bear Stearns on this issue prior to the approval of its CSE application. While TM believes that Bear Stearns implemented corrective action, TM never verified Bear Stearns' assertions that it had resolved this issue, as TM did not follow up on many of the OCIE issues.

- In two instances, the Commission approved the Order before the firms responded to the deficiency letter.

TM indicated that they discussed the issues orally with the firms and were comfortable with their responses and, as a result, recommended that the Commission issue the Orders. OCIE stated that it was not involved in this decision process at all.

**Recommendation 16:**
The Division of Trading and Markets should ensure that they complete all phases of a firm's inspection process before recommending that the Securities and Exchange Commission allow any additional Consolidated Supervised Entity firms the authority to use the alternative capital method.

# Finding 7: Collaboration Between TM And Other Commission Divisions/Offices Should Be Significantly Improved

TM should improve its collaboration with the Division of Corporation Finance (CF), OCIE, and the Office of Risk Assessment (ORA) in order to achieve efficiencies and the overall effectiveness of Commission operations.

## Collaboration with CF

The CF staff who review company filings (*e.g.,* Form 10-K) are assigned to Industry Groups within CF. CF assigns firms to a particular group based on their

Standardized Industrial Classification code.[177]  Periodically, CF management reassigns firms to adjust the staff's workload.  During the past two years, CF twice transferred the CSE firms to different Industry Groups.

CF staff stated that they received a briefing from TM regarding how the CSE program operates.  However, according to CF, TM did not provide any specifics regarding the information that the CSE program obtains from the CSE firms.

We believe that the information that TM obtains could substantially improve CF's filing review process.  For instance, CF could evaluate whether the information in the filing (e.g., mark to market accounting, VaR models, funding sources) is consistent with TM's information.  Furthermore, as a result of Bear Stearns' collapse, CSE firms are now required to disclose additional information regarding capital and liquidity.  Also, Basel's Pillar 3 standard (when implemented) will require additional disclosures regarding capital, risk exposures, and risk assessment.  TM stated that the CSE firms would incorporate all of these new disclosures mainly into their CF filings.  These additional disclosures will, therefore, increase the need for collaboration between TM and CF.

Our audit found that CF could not opine on the potential usefulness of TM's information on the filing review process since they are not aware of the information that TM receives on the CSE firms.  The effectiveness of CF's filing review is potentially diminished because CF is not incorporating TM's information on the CSEs into its review process.

**Recommendation 17:**
The Divisions of Corporation Finance (CF) and Trading and Markets (TM) should take concrete steps to improve their collaboration efforts and should determine whether TM's information on the Consolidated Supervised Entity (CSE) firms could be used by CF in its review of the CSE firms.

## Collaboration with OCIE

GAO found that TM and OCIE should improve communication (e.g., information sharing) between their offices.[178]  Although TM and OCIE informed GAO during its audit in 2007, that they were working on an agreement to improve communication, they never finalized the agreement.

In July 2007, Chairman Cox transferred the responsibility for inspecting the consolidated entities from OCIE to TM.  However, despite this organizational

---

[177] "The Standard Industrial Classification was created by the United States government as a means of classifying industries by the use of a 4-digit coding system to collect economic data on businesses." (Source:
http://www.business.com/directory/management/strategic_planning/business_information/industry_resea ch/classification_systems/standard_industrial_classification_sic/.
[178] Source: GAO. Financial Market Regulation, Agencies Engaged in Consolidated Supervision Can Strengthen Performance Measurement and Collaboration, Report No. 07-154.  March 15, 2007.

change, TM and OCIE could still improve their collaboration involving the broker-dealers of the CSE firms. OCIE stated that TM does not provide it access to information that TM obtains from meetings with CSE staff, filings submitted by the CSE firms, and other sources of information. OCIE stated that all of this information could improve their risk-based broker-dealer inspections. A senior staff official at a CSE firm stated there is no coordination between TM and OCIE and this creates a challenge. OCIE stated that it believes that it would still be useful to finalize the agreement to improve collaboration and TM has not identified any substantive reasons to oppose finalizing the agreement.

**Recommendation 18:**
The Division of Trading and Markets (TM) and the Office of Compliance Inspections and Examinations (OCIE) should develop a collaboration agreement (*e.g.,* discussing information sharing) that maintains a clear delineation of responsibilities between TM and OCIE with respect to the Consolidated Supervised Entity program. They should inform the Chairman's Office of any disagreement(s) so that the issue(s) can be resolved.

## Collaboration with ORA

The missions of ORA and the CSE programs' have certain similarities. ORA's mission includes identifying emerging issues and market risks[179] while the CSE's program mission states that its purpose is to:

> ... allow the Commission to monitor for, and act quickly in response to, financial or operational weakness in a CSE holding company or its unregulated affiliates that might place regulated entities, including US and foreign-registered banks and broker-dealers, *or the broader financial system at risk*.[180] [Emphasis added]

We believe that a formal understanding between ORA and TM would increase the likelihood that ORA achieves its mission while potentially minimizing duplicative efforts in identifying and analyzing risks.

**Recommendation 19:**
The Division of Trading and Markets and the Office of Risk Assessment should develop an agreement outlining their roles and responsibilities, as well as methods for information sharing such as communicating project results. These two offices should inform the Chairman's Office of any disagreement(s) so that the issue(s) can be resolved.

---

[179] Source: Jonathan Sokobin Named Director of SEC's Office of Risk Assessment. Commission. 28 February 2008. <http://www.sec.gov/news/press/2008/2008-24.htm>.

[180] Source: SEC [Commission] Consolidated Supervision of Broker-Dealer Holding Companies Program Overview and Assessment Criteria. Commission. 16 Mar 2007. <http://www.sec.gov/divisions/marketreg/cseoverview.htm>.

# Finding 8:  CF's Filing Review Of Bear Stearns' 2006 10-K Was Not Timely

CF is responsible for reviewing filings of all public reporting companies, such as Bear Stearns.  However, CF's review of Bear Stearns' 2006 10-K was not timely.

## Review of Bear Stearns' 10-K Filing

There are significant issues regarding CF's review of Bear Stearns' 2006 10-K filing dated November 30, 2006.  The filing review emphasized Bear Stearns' disclosures involving its exposure to subprime mortgage securities.[181]

Bear Stearns submitted its 2006 10-K filing to the Commission on February 13, 2007.  The CF staff accountant completed the initial review of Bear Stearns' 2006 10-K filing on April 30, 2007, approximately 2½ months after Bear Stearns submitted the filing.  Another CF staff accountant completed a second level review on September 27, 2007, nearly five months after the initial review.  CF could not provide a specific reason as to why the second reviewer did not perform the review in a timely manner.

CF sent a comment letter[182] to Bear Stearns on September 27, 2007, which, among other things, requested additional information on Bear Stearns' exposure to subprime mortgage securities.  Thus, it took CF nearly 7½ months, after Bear Stearns' initial filing, to send a letter to Bear Stearns requesting additional information.

CF's policy is to send a comment letter to a firm prior to the firm's next fiscal year-end.  In the case of Bear Stearns, its next fiscal year-end was November 30, 2007 and the Commission received its 2007 10-K on February 13, 2007.  According to CF's policy, CF needed to provide Bear Stearns with a comment letter before November 30, 2007.[183]  In this way, the firm would have an opportunity to incorporate appropriate changes into its next year's 10-K filing.  However, other than this policy, CF does not have any internal guidelines regarding timeframes within which to review filings and issue comment letters.[184]

---

[181] CF staff performed a targeted review that focused on subprime mortgage exposure and revenue recognition.

[182] The staff provide firms with a written memorandum (*i.e.*, a "comment letter") describing the staff's filing review comments.

[183] In this instance, CF met its policy of issuing a comment letter prior to Bear Stearns' fiscal year end.

[184] The Sarbanes Oxley Act of 2002 also requires CF to review each public reporting company at least one time every three years.

We believe that a five-month timeframe to complete a second review coupled with a total time of 7½ months to send a comment letter to Bear Stearns was simply unacceptable in this particular instance, because this filing review focused on the material issue of subprime mortgage securities (which was adversely affecting the securities industry worldwide).

Bear Stearns' response letter (coupled with CF's comment letter) contained material information that investors could have used to make well-informed investment decisions.[185]  For example, Bear Stearns' response letter described its criteria for classifying loans as sub-prime, information about its risk management philosophy, how it defines non-performing loans and a quantification of its investments in securities backed by subprime mortgages. The OIG expert believes that all of these criteria would have been helpful to investors.[186]

We did not perform audit work to determine CF's timeliness in reviewing 10-K filings in general.  Despite the lack of information about other filings, based upon CF's review of Bear Stearns' 10-K filing, we believe that the filing review process lacks the appropriate internal controls (i.e., timeframes for conducting second level reviews) to ensure timely reviews.

**Recommendation 20:**
The Division of Corporation Finance should: (1) develop internal guidelines for reviewing filings in a timely manner, and (2) track and monitor compliance with these internal guidelines.

## Bear Stearns' Response to CF's Comment Letter

Pursuant to CF policy, firms are supposed to reply within 10 business days to CF comment letters.  Thus, Bear Stearns' reply was due on October 12, 2007.  Prior to this due date, Bear Stearns asked CF (in writing) and received an extension until early November 2007 to file its response.  However, Bear Stearns did not respond by this new due date.  Bear Stearns then orally asked for and received additional extensions.  Bear Stearns finally submitted its comments to CF on January 31, 2008, nearly 3½ months after the initial due date.[187]

As a result of Bear Stearns' delays, the CF staff accountant did not complete the initial review of Bear Stearns' response until March 4, 2008 and the second

---

[185] This information was especially material given that Bear Stearns' stock price went from a one-year closing price high of $158 (April 25, 2007) to a closing price high of $77 the week before March 10, 2008.  The final price was $10, the sale price that JP Morgan paid.

[186] CF does not consider its public comment letters and firms' response letters as a means of disseminating (i.e., disclosure) information about public companies.  Rather, CF believes that changes to a firm's filings, as a result of CF's comment letters, should be the primary disclosure method.  In fact, CF does not post its public comment letters and a firm's response letters to the public site of EDGAR until an issue has been fully resolved.

[187] Two other CSE firms did not respond in a timely manner to comments on their 2006 10-K filings.  These filing reviews also emphasized subprime mortgages.

reviewer did not complete her review until April 2, 2008, by which time Bear Stearns had already collapsed.

It is our understanding that Bear Stearns' delay in responding to the comment letter was not a unique situation and CF routinely grants extensions to firms to address CF's comment letters.  Further, CF informed us that it only requests a firm to contact CF within 10 days of receiving a comment letter and does not require a substantive response to the issues within the 10-day timeframe.  Thus, while CF imposes a timeframe for a firm to contact CF, CF does not have a policy prescribing when firms are expected to respond to the issues raised in CF's comment letters.

While there are several consequences that may be imposed on a firm for not responding timely (e.g., the firm may be required to make additional disclosures in future filings regarding the outstanding staff comments or the staff may refer the matter to the Commission's Division of Enforcement for investigation), in the case of Bear Stearns, none of these consequences occurred.  Furthermore, by granting repeated extensions, the filing review was rendered less meaningful since the staff completed the filing review after Bear Stearns collapsed.  As a result, we believe that investors could have used this material information to make well-informed investment decisions.  In addition, the information (e.g., Bear Stearns' exposure to subprime mortgage securities) could have potentially been beneficial to dispel the rumors that led to Bear Stearns' collapse.

**Recommendation 21:**
The Division of Corporation Finance (CF) should (1) establish a policy outlining when firms are expected to substantively respond to issues raised in CF's comment letters, and (2) track and monitor compliance with this policy.

# Finding 9:  Certain Firms May Pose A Systemic Risk Because They Are Not Supervised On A Consolidated Basis

> Certain firms may pose a systemic risk because neither the Commission nor any other regulator currently supervises them on a consolidated basis.

Several large firms, other than the CSEs, have many customer accounts, hold large amounts of customer funds, and have unregulated affiliates.  The broker-dealer affiliates of these firms are subject to the Risk Assessment program, but neither the Commission nor any other regulator supervises these firms on a consolidated basis.[188]  In most cases, these firms would be ineligible to apply for

---

[188] Some of the firms are also subject to the Investment Advisers Act of 1940 and the Investment Company

group-wide supervision under the CSE program.  In some cases, these firms could voluntarily elect to be supervised under the Commission's CSE program or under the statutory supervision regime created by Gramm-Leach-Bliley Act,[189] but these firms are not required to elect this supervision.

Several firms both inside and outside the CSE program collapsed or otherwise experienced serious financial difficulties between March and September 2008.[190] As a result, we believe that if one of these other (non-CSE) firms failed or experienced another significant problem, the broader financial system could be adversely affected, thus impacting the Commission's mission of maintaining fair, orderly, and efficient markets.  We did not perform an in-depth assessment of the risks that these firms present or the costs/benefits of supervising these firms on a consolidated basis because of resource constraints.  However, we believe that in light of the impact of Bear Stearns collapse, it would behoove the Commission to perform such an analysis.

**Recommendation 22:**
Chairman Cox should create a Task Force led by the Office of Risk Assessment (ORA) with staff from the Divisions of Trading and Markets, and Investment Management, and the Office of Compliance Inspections and Examinations.  The Task Force should perform an analysis of large firms with customer accounts that hold significant amounts of customer funds and have unregulated entities, to determine the costs and benefits of supervising these firms on a consolidated basis.  If the Task Force ultimately believes that the Securities and Exchange Commission (Commission) should supervise these firms on a consolidated basis, it should make a recommendation to the Commission that involves seeking the necessary statutory authority to oversee these firms on a consolidated basis.

---

Act of 1940.  As a result, OCIE is responsible for inspecting these firms and the Division of Investment Management is responsible for the regulations.

[189] "The Gramm-Leach-Bliley Act of 1999 ("Act") will significantly impact the financial services industry.  By repealing provisions of the Glass-Steagall Act, the Act facilitates affiliations between banks, securities firms, and insurance companies."
Source: Banking Information: Overview of the Gramm-Leach-Bliley Act. Federal Reserve Bank of San Francisco. < http://www.frbsf.org/publications/banking/gramm/grammpg1.html>.

[190] Between March and September 2008, Bear Stearns, Lehman Brothers, Merrill Lynch, mortgage originators Fannie Mae and Freddie Mac and the American International Group, Inc., all experienced major financial difficulties and collapsed, filed for bankruptcy, or were purchased or taken over by another entity.

# Finding 10:  TM Should Address Organizational Issues Involving The Future Of The CSE Program

We identified several organizational issues involving the future of the CSE Program, which could significantly improve the CSE program.

## Changes to the CSE Program

Due to the collapse of Bear Stearns in March 2008, the bankruptcy filing by Lehman Brothers, the purchase of Merrill Lynch by Bank of America, the planned change in status to bank holding companies for Goldman Sachs and Morgan Stanley, [191] and the changing economic environment, the future of the CSE program is uncertain.

Since the collapse of Bear Stearns, several aspects of the CSE program's oversight activities have changed and other changes are being contemplated, as follows:

- The CSE program staff now closely scrutinize the secured funding activities of each CSE firm, with a view to lengthening the average term of secured and unsecured funding arrangements;

- The CSE program staff now obtain more funding and liquidity information for all CSEs;

- TM is in the process of establishing additional scenarios that entail a substantial loss of secured funding.  The scenario analyses help TM to determine whether firms could survive in a stressed environment;

- TM is discussing with CSE senior management their long-term funding plans, including plans for raising new capital by accessing the equity and long-term debt markets.

- The Commission plans to request legislative authority to regulate the CSEs at the holding company level as well as the authority to require compliance.  Currently, participation in the CSE program is voluntary.  TM claims that the voluntary nature of the program does not capture all systemically important broker-dealer holding companies, as companies may not opt for such supervision.  Additionally, the ability of a holding company to opt out of supervision creates tension when the Commission wishes to impose more rigorous requirements or mandate CSEs to address specific concerns, according to TM;

---

[191] On September 21, 2008, the Federal Reserve approved, pending a statutory five-day antitrust waiting period, applications from Goldman Sachs and Morgan Stanley to become bank holding companies.

- Chairman Cox has discussed the CSEs programs' need to have systems in place to systematically unwind or liquidate a failing institution at the holding company level.  Currently, regulators are only permitted to intervene in the liquidation of a holding company's subsidiaries, such as broker-dealers and banks.

  According to TM, intervention at the holding company level would allow the Commission to operate a failing institution for a limited period of time and would protect the institution's customers and counterparties.  Such holding companies typically have substantial activities outside its U.S. bank or broker-dealer.  TM believes that the Commission's lack of authority to intervene at the holding company level could lead to massive liquidations of collateral by counterparties to unregulated or non-U.S. regulated affiliates, which in turn, could cause market dislocations and put severe stress on other systemically important financial institutions; and

- The Commission has contemplated ways to improve the efficient and orderly operation of the tri-party repo market.  Financial institutions rely on the repo market to finance proprietary and customer positions.  If a repo clearing entity is unable to conduct business in an orderly manner, or if a major firm does not have ready access to the repo market, it could have systemic effects on a large number of financial institutions.  Bear Stearns was not able to access the repo market on normal business terms, which, according to some accounts, led to its demise.

Changes to the program will require Chairman Cox, Congress, and TM to re-evaluate the needs and priorities of the CSE program.

**Recommendation 23:**
The Division of Trading and Markets, in consultation with the Chairman's office, should determine what additional changes need to be made to the Consolidated Supervised Entity (CSE) program in light of the collapse of Bear Stearns and changing economic environment.

## Program Staffing

The CSE program consists of a small number of staff, several of whom have worked in the CSE program since its inception in 2004.  The Office of CSE Inspections currently has only two staff in Washington, DC and five staff in the New York regional office.  It also does not currently have an Assistant Director (*i.e.,* an office head).

In July 2007, TM assumed the responsibility for conducting inspections of the CSE firms.  However, as of mid-September 2008, TM staff had not completed any inspections in the 14 months that the office has been operational.  Three inspections are in varying stages of completion.  These inspections act to "assess the adequacy of the implementation of the firm's internal risk

management policies and procedures".[192]   No milestones are in place to ensure that inspections are completed in a timely manner.

Furthermore, staff at the CSE firms informed the OIG that the inspections information would be useful to them, especially because it would provide the CSEs with information regarding best practices and where the firms stand in relation to each other.  It is imperative to receive this information timely to ensure that the information does not become outdated.

**Recommendation 24:**
The Division of Trading and Markets (TM) should fill critical existing positions, and consider what any additional staff it believes will be needed to carry out the CSE program's function going forward.  TM should also establish milestones for completing each phase of an inspection and implement a procedure to ensure that the milestones are met.

## Ethics Manual

In 1997, OCIE developed an ethics manual for its Inspection staff because it wanted to formalize standards of behavior and ensure that inspections are conducted in a fair and impartial manner.  This manual has been revised and expanded several times since 1997.  We believe that a similar manual would be beneficial for TM's monitoring and inspection staff given their close working relationship with the CSE staff.

**Recommendation 25:**
The Division of Trading and Markets, in consultation with the Office of Compliance Inspections and Examinations and the Commission's Ethics office, should develop an ethics manual.

## Coordination with Other Regulators

The CSE program staff are increasingly working with the Federal Reserve and other Federal regulators in its administration of the CSE program.  Increased coordination with the Federal Reserve is particularly important because the Federal Reserve, unlike the Commission, is in a position to provide emergency funding to distressed firms.  Improved communication and information sharing among Federal regulators should also reduce overlaps and alleviate the firms' need to produce duplicative information for each entity.  The memorandum of understanding that the Commission and the Federal Reserve entered into in July 2008 is a positive step.

Additionally, we believe that the CSE program staff will need to further recognize the interconnectedness between securities firms and banks.  A general

---

[192] Source: SEC [Commission] Holding Company Supervision Program Description.  Commission. 5 June 2008.  <http://www.sec.gov/divisions/marketreg/hcsupervision.htm>.

perception, as communicated by a staff member at a CSE firm, is that if a broker-dealer fails, the Commission seems to worry only about customer assets, and if a bank fails, the Federal Reserve seems to worry only about depositors' accounts.  Neither regulator appears to focus on systemic risk, nor how the interconnectivity among securities firms and banks affects the overall landscape.

**Recommendation 26:**
The Division of Trading and Markets should continue to seek out ways to increase its communication, coordination, and information sharing with the Federal Reserve and other Federal Regulators